UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x

**CHRISTOPHER FUGELSANG,**


Plaintiff                                  **Docket No: 23-CV-08332 (LDH)(LKE)**


-against-



**THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK,**

Defendant


_____x



**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**




CHRISTOPHER FUGELSANG
216 Beach Breeze Place
Apt. #2
Arverne, N.Y. 11692
cfugelsang@gmail.com

## PRELIMINARY STATEMENT

Plaintiff CHRISTOPHER FUGELSANG ("Plaintiff") submits the arguments below in opposition to the DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK's (henceforth "Defendant") Motion To Dismiss his Complaint. Plaintiff accepts as true and does not dispute Defendant's Statement of Facts (pp. 2-4) but argues against the conclusions and facts in their Argument starting on p. 4. Plaintiff also dismisses any claim to Section 1981. Plaintiff requests this Court accept all documents in full by reference herein which have been submitted to this Court previously (Exhibits A-I) as well as Exhibits J-T referenced here and submitted in the Declaration of Material Facts under Rule 12(b)(6) attached.

Plaintiff has made a fact-based plea for restoration of his tenured employment and back pay after Defendant wrongfully terminated him in violation of Title VII and without engaging in a protected due process procedure known as §3020 arbitration mandated by his status as a tenured special education teacher in New York City. His termination was not a simple employment matter, but a Civil and Human Rights violation at the level of being Constitutionally "unsound". See the Scher letter, Exhibit F, Complaint. The City of New York deliberately created unlawful procedures for Title VII accommodations for religious "exceptions" -which have no claim to relief and are not mentioned in TITLE VII - in order to circumvent Plaintiff's legal rights to any accommodation. No accommodation was given or suggested by Defendant at any time, even though the rubber rooms were open as well as "rubber" home reassignment.

The term LWOP created by Martin Scheinman's Impact Bargaining Award sent to Plaintiff on or about September 10, 2021 as well as the Citywide 'Reasonable Appeals

2

Panel" created by the Defendant to hear religious "exemption" appeals were clearly unconstitutional in their strategies to hear any appellants, including Plaintiff, in a meaningful manner. The City's Appeals Panel was similarly unconstitutional. Shockingly, in January 2023 Plaintiff discovered that Defendant secretly placed a problem code on Plaintiff's personnel file on or about October 4, 2021, which made clear that Plaintiff was being disciplined and punished for his "misconduct" because he did not get vaccinated against COVID due to his religious beliefs.

In sum, Plaintiff was fired for holding onto his sincere religious beliefs without due process. Defendant's Motion To Dismiss is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not and redirect this Court's attention from the egregious and unscrupulous actions and behaviors of the Defendant. Defendant's papers ignore the four corners of Plaintiff's Complaint and disregard the facts in the detailed factual allegations which are to be accepted as true. Defendant's Motion To Dismiss must be dismissed in its' entirety.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a pleading must. contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss brought pursuant to Rule 12(b)(6), the pleadings must contain enough facts to state a claim to relief that is plausible on its face." Dellatte v. Great Neck Union Free Sch. Dist., No. 10-cv-4348, 2012 WL 164078, at *1 (2d Cir. Jan. 20, 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). The court must accept all factual allegations in the

complaint and draw all reasonable inferences in the plaintiff's favor." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008).

**POINT I**

**NOTICE OF CLAIM REQUIREMENTS ARE NOT APPLICABLE TO §1983 SUITS BROUGHT IN FEDERAL COURT**

New York's Notice of Claim requirements were applicable to §1983 suits in state court but not federal court prior to Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302. See, e.g., Brandon v. Board of Education, 635 F.2d 971, 973 n. 2 (2d Cir. 1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); Courtemanche v. Enlarged City School District, 686 F.Supp. 1025, 1032 (S.D.N.Y. 1988); Burroughs v. Holiday Inn, 621 F.Supp. 351, 353-55 (W.D.N.Y. 1985); Williams v. Allen, 616 F.Supp. 653, 656-59 (E.D.N.Y. 1985); Paschall v. Mayone, 454 F.Supp. 1289, 1298 (S.D.N.Y. 1978). Felder v. Casey noted that although the Supreme Court itself "ha[d] never passed on the question, the lower federal courts have all, with but one exception, concluded that notice-of-claim provisions are inapplicable to § 1983 actions brought in federal court." 487 U.S. at 140, 108 S.Ct. at 2307. The lone exception referred to in Felder was Cardo v. Lakeland Central School District, 592 F.Supp. 765, 772-73 (S.D.N.Y. 1984), which was not authoritative, since it was contrary to the principle stated in Brandon v. Board of Education, 635 F.2d at 973 n. 2, upholding a ruling that compliance with the state's notice-of-claim provision was not a precondition to the district court action. Since the filing of a notice of claim was not a prerequisite to the federal-court suit, a municipality perforce could not require a delay of the commencement of a federal-court suit pending an examination based on such a notice. See Day v Moscow 955 F.2d 807 (2nd Cir 1992).

Plaintiff filed a timely Notice of Claim against Defendant for putting a Problem Code on his

personnel file on or about October 4, 2021, when he did not hand in a COVID vaccination card. This information was given to him by other former UFT members who sent him the email from Karen King at the UFT as well as the Declaration of Betsy Combier in the Kane-Keil case, on or about January 15, 2023. See **Exhibits J**, Karen King Email; and **Exhibit K**, Declaration of Betsy Combier with the email from NYC DOE employee Eric Amato; and **Exhibit S**: PERB Decision U-32479 on the secrecy of the Defendant with the Problem Code database.

The City's argument that Plaintiff's failure to file a Notice of Claim within 90 days of his wrongful termination is unavailing. General Municipal Law §50-e(1)(a) requires service of a notice of claim within 90 days after the claim arises "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation". General Municipal Law 50-i (1) precludes commencement of an action against a city "for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such a city" unless a notice of claim has been served in compliance with section 50-e. The Appellate Division departments addressing the issue have determined that the General Municipal Law and [s]ervice of a notice of claim is therefore not a condition precedent to commencement of an action based on the Human Rights Law in a jurisdiction where General Municipal Law §§50-e and 50-I provide the only notice of claim criteria" (Picciano v Nassau Cty. Civ. Serv. Comm., 290 AD2d 164, 170 [2d Dept. 2001]; see Sebastian v New York City Health and Hosps. Corp., 221 AD2d 294, 294 [1st Dept. 1995]); Palmer v City of New York, 215 AD2d 336, 336 [1st Dept. 1995]).

Human rights claims are not tort actions under 50-e and are not personal injury, wrongful death, or damage to personal property claims under 50-i. Thus, there is no notice of claim requirement

here, and POINT I in the Defendant's Motion must be dismissed in its' entirety.

## POINT II

## <u>PLAINTIFF'S SHRL AND CHRL CLAIMS ARE NOT TIME BARRED</u>

Plaintiff's claims to relief cited in his Complaint are not time-barred and were not based on application of Education Law § 3813. See the discussion under POINT I above, and further discussed below in POINT III. In Amorosi, the case cited by Defendant in their Motion p.5, the Petitioner applied Education Law §3813 (2-b) to the Executive Law §296 claim and filed for an extension of time to file a Notice of Claim in compliance with 50-e. Here, Plaintiff did not do that.

Also in Amorosi, the Court ruled that: "In Koerner v State of N.Y., Pilgrim Psychiatric Ctr. ( 62 NY2d 442, 446) and Murphy v American Home Prods. Corp. ( 58 NY2d 293, 307), we concluded that the history of the Human Rights Law (Executive Law § 290 et seq.) compelled the conclusion that the statute of limitations for a discrimination claim is three years"….[except] if a non-tort claim is based upon Education Law §3813(2-b).

Here, Plaintiff's Executive Law § 296 claim is not subject to either notice of claim provision because his discrimination action is not a tort claim pursued under that statute. Plaintiff filed a Notice of Claim (Charles Ex. 2) about the problem code when he first heard about this scarlet letter being in his personnel file and his fingerprints were given a flag in the Galaxy database. He filed his Complaint stating and enlarging the discriminatory animus of the Defendant pursuant to Federal Laws of Civil and Human Rights to reference to his religious beliefs. He did not make a claim against the Defendant pursuant to the school district's actions per se.

POINT II must be dismissed in its entirety.

## POINT III

**PLAINTIFF HAS PLED SUFFICIENT FACTS TO SUPPORT HIS CLAIM OF DISCRIMINATION PURSUANT TO TITLE VII, FIRST AMENDMENT, FREE EXERCISE CLAUSE, NYCHRL AND NYSHRL**

The criteria for discrimination under a prima facie Title VII claim includes: Plaintiff (1) is a member of a protected class; (2) was qualified for his position and satisfactorily performed his duties; (3) suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination."In this matter, a review of Plaintiff's Exhibits attached to his Complaint (Exhibits A, B, C, D, E,H); attached here to this Opposition (Exhibits J, K, L, M, N) and  to  the City's Motion (Exhibits 4, 5, 6, 7) shows conclusively that Plaintiff has a sincere religious belief in the harm to come to him if he got vaccinated with the COVID vaccine. His facts are visible, credible and valid. But he did not have to "prove" his beliefs in the first place. The burden, after he gave his proof, falls onto the Defendant to prove that they had an undue burden in giving him an exception to the vaccine. This standard, key to this case, of making an effort to accommodate Plaintiff as a tenured teacher unable to be vaccinated was never attempted in any form. The Defendant rests on "we have an undue burden" even in the face of the latest ruling, namely Groff v DeJoy (see Complaint, and argument below).

In *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), the Tenth Circuit held that state university employees were likely to succeed on Free Exercise and Establishment Clause claims and entitled to preliminary injunction against denials of religious accommodation to a vaccine mandate. In *Does*, the Court affirmed that a vaccine mandate is "in no way generally applicable" when government evaluates employee religious beliefs case-by-case, allowing "individualized exemptions" to applicants whose beliefs, in the government's discretion, merit accommodation. Additionally in that case the Defendant adopted

a facially discriminatory policy and then after litigation, offered a so-called "remedial" policy. Plaintiff argues here that the hostility by the Defendant toward the Plaintiff in this matter defeats neutrality at every level of review, which suggests pre-textual discrimination.

The Problem Code exposed the lies given by Martin Scheinman in his September 10, 2021 Impact Bargaining Award, namely that the LWOP and termination of employees of the NYC DOE were in *not* disciplinary, when clearly, these actions were punishment and disciplinary in effect and intent. Plaintiff was punished for misconduct without any due process.

The Court in DOES (10th Cir.) stated that:

""a government policy that requires an intrusive inquiry into the validity of religious beliefs violates the Establishment Clause regardless of any purported government interest." 100 F.4th at 1268."

To survive a motion to dismiss, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face. Plaintiff has done this here in support of his Complaint. Plaintiff, a stellar tenured teacher without any disciplinary action against him in his teaching career, was suddenly put on a Leave Without Pay (LWOP), his fingerprints were flagged by a Problem Code which meant he was blocked from ever getting a job with the Defendant due to the stigma now attached to his file, solely because of his religious beliefs. Defendant punished Plaintiff for believing that the COVID vaccine conflicted with what he could put into his body, and therefor he could not get vaccinated. Employees of the NYCDOE were denied unemployment due to "misconduct". **Exhibit L**. Plaintiff argues that he has pled facts sufficient to prove *more* than an inference of discrimination against his employer, the Defendant, and he does not rely on simple conclusions. It's a fact that Scheinman's September 10 Award (**Ex. C**) discriminated against all tenured teachers who applied for religious exemptions, but held out on discriminating against a select few. The Award stated in relevant part:

"Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the

8

leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations,e.g., Christian Scientists"

( See also **Exhibit M**, Graff Letter on Eric Eichenholtz and the Citywide Appeals Panel).

This action shows invidious discriminatory animus within a disciplinary policy put forth by the Defendant as valid under the law. How so? Plaintiff does not belong to the Christian Scientist faith, and his religious beliefs (Catholic) are personal. He did not fit into the Scheinman criteria for getting a religious "exemption". As the Defendant's requirements for working while unvaccinated was that an employee apply for an exception (RE,ME) rather than an "accommodation", appellants were put outside of Title VII accommodation by deceit and design. Clearly the criteria prescribed by the Award is discriminatory, and intentionally so. Plaintiff received an X in the box "denied" after he had his 10 minutes in the Scheinman SAMS hearing in front of Barry Peek, Esq., who works for Mr. Scheinman. (**Exhibit E**) Dividing up any religious belief with criteria such as seen in the Scheinman award only serves those who fit into the narrow band allowed to have an exemption. Scheinman himself apologized for his error in creating LWOP in his second arbitration Award issued June 27. (**Exhibits F, G**)

Scheinman proceeded to punish all employees of the NYC DOE who "intentionally" disregarded the mandate, by terminating everyone who dared to challenge the COVID mandate.

It was Scheinman who "created a new leave without pay" by issuing the Award. Scheinman establishes, by his own words, that he actively participated in the violation of the Plaintiffs' due process rights by "creat[ing] a new leave without pay" policy that took away any accommodations, changed AWOP (absent without pay) which is disciplinary, and made AWOP

into LWOP but as NOT disciplinary so no tenured employee could have a due process §3020-a hearing. This was deliberate and wrongful termination. See **Exhibit N**: Rights of Tenured Employees.

Graff cited as follows: Scheinman …actively created new policy that, as Scheinman admits, but-for his Award, "the Department was without the authority to remove these employees from the payroll without providing a due process hearing... admitting that his actions caused the Plaintiffs to "suffer[] a denial of [their] federal statutory rights, or [their] constitutional rights or privileges."Annis v. County of Westchester, 136 F.3d 239,245 (2d Cir. 1998).

Plaintiff and his plea for an exemption from the vaccine was never heard by anyone. This is not in compliance with the 14th Amendment Due Process Clause. He was not heard because the procedures Defendant set up made it impossible. Defendant did not want anyone, including Plaintiff, appealing their denial of a religious exemption to be given any due process. The Defendant wanted them all fired, period. Plaintiff is a tenured teacher, could not be terminated nor be given any reduction in salary without a mandated due process procedure known as "3020-a arbitration." See **Exhibits F, M, N**.

Indeed, the Court in the Kane-Keil case made note of the irregularities in the Scheinman Awards, and on 11/28/21 the SAMS process was discarded as "constitutionally unsound". The United States Court of Appeals for the Second Circuit ordered a new panel, the Citywide Reasonable Appeals Panel, to follow Title VII. See **Exhibit F(a):** Court of Appeals Order.

The new procedure was no better than the SAMS panel process was, now in the trash. Plaintiff's denial would have alarmed any legitimate policy maker or legal analyst, had they seen this. What else, pray tell, did the secret panelists on the Citywide Panel use? We do not know. In fact, before Eric Eichenholtz' deposition was made public in social media in the case New Yorkers

For Religious Liberty, Inc., et al., v The City of New York, et al., NYED Docket #2022-cv-00752, nothing was known at all about "The Citywide Panel". Before and after the submission of his religious exemption request was submitted to the Citywide Panel, Plaintiff was not allowed to speak in front of any member of the Panel, and never knew who made the decisions or why his Appeal was denied by "them/him/her, whomever". This is most certainly discriminatory, and bad faith.  An inference that Plaintiff was discriminated against and set up to fail must be made. He was discriminated against because his religious beliefs would not permit him to get vaccinated with the COVID vaccine. The panic and hatred the Defendant marketed about those employees who were not vaccinated was harsh, demeaning, and discriminatory. Many people saw similarities with the AIDS epidemic in the 1980's, when anyone with AIDS was fired and ostracized.

Title VII of the Civil Rights Act of 1964 addresses religious freedom. The act prohibits employers from discriminating against its employees because of their sincerely held religious beliefs. Title 42 United States Code section 2000e-2(a) states: ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin").

The Supreme Court case the EEOC v. Abercrombie & Fitch Stores, Inc. 575 U.S. 768 (2015) concluded that "An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. Title VII contains no knowledge requirement. Furthermore, Title VII's definition of religion clearly indicates that failure-to-accommodate challenges can be brought as disparate-treatment claims. And Title VII gives favored treatment

11

to religious practices, rather than demanding that religious practices be treated no worse than other practices. Id., 575 (slip opinion pages 2–7).

Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief." Moreover, as the EEOC has made clear, Title VII's protections also extend nonreligious beliefs if related to morality, ultimate ideas about life, purpose, and death. See EEOC, Questions and Answers: Religious Discrimination in the Workplace (June 7, 2008), Questions and Answers: Religious Discrimination in the Workplace | U.S. Equal Employment Opportunity Commission (eeoc.gov) ("Title VII's protections also extend to those who are discriminated against or need accommodation because they profess no religious beliefs . . . . Religious beliefs include theistic beliefs, for example, those that include a belief in God as well as non-theistic 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.' Although courts generally resolve doubts about particular beliefs in favor of finding that they are religious, beliefs are not protected merely because they are strongly held. Rather, religion typically concerns 'ultimate ideas' about 'life, purpose, and death'").

The First Amendment to the Constitution protects Plaintiff's free exercise of religion and mandates state accommodation for members of religious groups who object to the vaccinations on religious grounds. The Free Exercise Clause recognizes and guarantees Americans the ''right to believe and profess whatever religious doctrine [they] desire.'' Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 877 (1990).

The Free Exercise Clause also ascertains that government may not attempt to regulate religious beliefs, compel religious beliefs, or punish religious beliefs. Sherbert v. Verner, 374 U.S. 398,

402 (1963); Torcaso v. Watkins, 367 U.S. 488, 492–93, 495 (1961); and United States v. Ballard, 322 U.S. 78, 86 (1944).

Government may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. Plaintiff argues that the "criteria" mystery (i.e. details as to what the criteria are) of the SAMS Panel and the Citywide Panel show animus and discrimination against the unvaccinated Plaintiff because anything could be used against him and was. He was not told why a person was granted a religious exemption or, like him, denied. What made him different in a class of folk already in a "different" – but unknown category?  See Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; McDaniel v. Paty, 435 U.S. 618, 627 (1978). This discriminatory procedure did not last. See **Exhibit L(a),** Chu UI. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; Sherbert v. Verner, 374 U.S. 402 (1963). Robert H. Jackson, stated:''If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith herein.''. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious tradition. Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, ''religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment

protection.'' Church of the Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 531 (1993) They must merely be ''sincerely held.'' Frazee v. Illinois Dept. of Employment Security, 489 U.S. 834 (1989). Importantly, the protections guaranteed by the Free Exercise Clause also extend to acts undertaken in accordance with such sincerely held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to ''exercise'' religion, not just the freedom to ''believe'' in religion. Employment Div. v. Smith, 494 U.S. 877 (1990); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 716 (1990); McDaniel v. Paty, 435 U.S. 627 (1978; Sherbert v. Verner, 374 U.S. 403–04 (1963); and Wisconsin v. Yoder, 406 U.S. 205, 219–20 (1972).

The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." Lyng vs Northwest Indian Cemetery Protection Association , 485 U. S., 450 (1988). ''It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.'' (Sherbert v. Verner, 374 U.S. 404 (1963). Because a law cannot have as its official ''object or purpose . . . the suppression of religion or religious conduct,'' a law must ensure that it is actually neutral and of general applicability. Church, 533-534.

A law is not neutral if it singles out particular religious conduct for adverse treatment, treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons, applies uncalled for restrictions on religious conduct''; or ''accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices.'' Id. 538.

A law is not generally applicable if ''in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief,'' Id 543., including by ''fail[ing] to prohibit nonreligious

14

conduct that endangers [its] interests in a similar or greater degree than . . . does'' the prohibited conduct, id., or enables, expressly or de facto, ''a system of individualized exemptions,'' as discussed in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 884 (1990); see Church, 537. ''Neutrality and general applicability are interrelated, . . .[and] failure to satisfy one requirement is a likely indication that the other has not been satisfied.'' Id, 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. See Trinity Lutheran Church of Columbia, Inc. v. Comer, Director, Missouri Department of Natural Resources, 582 U.S. (slip opinion pages 9–11) (2017). Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, Church, 546. [O]nly in rare cases'' will a law survive this level of scrutiny. Id 546. Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. Trinity Lutheran Church of Columbia, Inc. v. Comer 582 U.S. (slip opinion. Page 6) (2017); see also Good News Club v. Milford Central Sch., 533 U.S. 98, 114 (2001), and Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 837, 841 (1995)).

The Defendant's Motion To Dismiss must be denied.

## POINT IV

### PLAINTIFF HAS SUFFICIENTLY PLED DEFENDANT'S FAILURE TO ACCOMMODATE UNDER TITLE VII

15

In a letter submitted to this Court dated February 29, 2024 requesting a pre-motion conference,

the Defendant cited the following criteria for alleging a failure to accommodate under Title VII:

While under the CHRL, in order to adequately allege a failure to accommodate
a religious belief claim Plaintiff must allege that "(1) he has a bona fide religious belief that
conflicts with an employment requirement; (2) he informed the employer of his belief; and (3) he
was disciplined for failing to comply with the conflicting employment requirement." Marte v.
Monetefiore Med. Ctr., No. 22-CV-03491(CM), 2022 U.S. Dist. LEXIS 186884, at *19
(S.D.N.Y. Oct. 12, 2022).

In this matter Plaintiff has satisfied this criteria. However, the Defendant left out the most

important part of the Human Rights Law as it applies in the workplace: the employer must give a

reasonable accommodation even if claiming an undue burden. An explanation for the alleged

"undue burden" was never given to Plaintiff (Charles' **EXHIBIT 3**) in violation of Groff v

Dejoy  (Groff v. DeJoy, 143 S. Ct. 2279 (2023)) issued by the US Supreme Court in 2023. From

the American Bar Association:

https://www.americanbar.org/groups/labor_law/publications/labor_employment_law_news/winte
r-issue-2024/supreme-court-ruling-groff-v-dejoy/;

"The U.S. Supreme Court's June 2023 ruling in *Groff v. DeJoy* constitutes a major change in the

legal landscape involving religious accommodation in the workplace. The Court's decision

clarified a heightened standard for determining whether a religious accommodation causes

"undue hardship on the conduct of the employer's business" under Title VII of the Civil Rights

Act of 1964.

Under Title VII…. The Court held that showing more than a de minimis cost is no longer
sufficient to qualify as undue hardship under Title VII. Instead, and without deciding whether
Groff should have been accommodated in this case, the Court clarified that Title VII requires an
employer that denies a religious accommodation to show that the burden of granting the religious
accommodation would result in "substantial increased costs in relation to the conduct of its
particular business."…. the Court reasoned that undue hardship "means something very different

16

from a burden that is merely more than de minimis, i.e., something that is 'very small or trifling.'" The Court also reviewed the 1977 decision in Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977), which has been interpreted as holding undue hardship means de minimis cost. The Court stopped short of overturning Hardison but explained that that the de minimis interpretation of Hardison is erroneous and showing "more than a de minimis cost as that phrase is used in common parlance, does not suffice to establish undue hardship under Title VII."

With respect to the new "substantial increased costs" standard, the Court explained that employers must take into account "all relevant factors in the case at hand, including the particular accommodation at issue and their practical impact in light of the nature, size, and operating cost of an employer."

The Defendant has blatantly ignored all the laws demanding a reasonable accommodation for Plaintiff with the meaningless get out of jail free card claiming "undue burden". The Defendant never engaged in a corporative dialogue with the Petitioner regarding an accommodation to satisfy the requisites of his job, in direct violation of the New York City Human Rights Law NYC Admin Code 8-107 (28)(e): "…potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity."

Under federal law, the City of New York must make reasonable accommodations for religious practices of its employees, unless the accommodation results in undue hardship on the conduct of the employer's business. *Baker* v. *The Home Depot,* 445 F.3d 541 (2d Cir. 2006). Furthermore, the City of New York must reasonably accommodate an employee who's sincerely held religious belief, practice, or observance conflicts with a work requirement, unless the accommodation would create an undue hardship or present a direct threat. *See NYC Admin. Code* 8-107(3).

The Defendant never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendant's concern for "a safe environment for in-person learning." *Ansonia Bd. ofEduc. v. Philbrook,* 479 U.S. 60, 68-69

17

(1986). Furthermore, to establish the existence of an undue burden, the Defendant must show that accommodating the employee would cause a "significant interference with the safe or efficient operation of the workplace." *See NYC Admin. Code* 8-107(3)(b). Moreover, "the determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, *in a cooperative dialogue." See NYC Admin. Code* 8-107 (28)(e) (emphasis added).

Finally, agency personnel who do not interact in a cooperative dialogue and then make decisions that do not accommodate the employee, fail to comply with statutory authority. Simply citing an "undue hardship" is not an explanation for denial of a reasonable accommodation.

The Defendant in their Motion To Dismiss **never offered a single document or factual evidence that showed any effort towards accommodating Plaintiff ever took place.**

**(***emphasis added***)**

Here, in this case, the Defendant never gave any rational basis to deny his religious exemption request and any accommodation.  The Department totally failed in this duty.

 The remedy for the destruction of Federal rights seen here could have been to place anyone who had a sincere religious belief that prohibited him/her from being vaccinated against COVID into an alternate site which the Defendants called "Reassignment", or  the "Rubber Room". See

   **The "Gotcha Squad" and the New York City Rubber Rooms**

**https://nycrubberroomreporter.blogspot.com/2009/03/gotcha-squad-and-new-york-city-rubber.html**

Indeed,  the Defendant deceived the Court and the EEOC in their Position Statement and in their Motion To Dismiss by failing to acknowledge their well-known accommodations called the

"Rubber Rooms" or Reassignment rooms set aside for employees who are removed from their jobs but not taken off salary. See **EXHIBITS O., P.,** and the blog "NYC Rubber Room Reporter and ATR Connect" and website "ADVOCATZ.com." Exhibit P is the Reassignment Guide for a NYCDOE employee who has been assigned a home-based reassignment placement after being told not to show up at the school in October 2022.

Tenured employees who work for the Department of Education similar to Plaintiff in this matter, who are accused of anything, from getting an "Unsatisfactory" on their observation reports to having sex with students and everything in between, have been, for more than 20 years, reassigned to a place where they sit and do nothing but get their **full salary** while awaiting the start of a 3020-a arbitration or the issuance of an unsubstantiated complaint. OPI, the Office of Personnel Investigations, and the Office of Employee Relations both have authority over the reassignment of employees as well as the problem Code. Some people sit in the rubber rooms for more than 10 years. Ironically, since schools were closed in 2020, the place for a rubber room has been home, or wherever the person lives. This reassignment has been called the "rubber home". (**Ex. O**)

The sob story given by the Defendant about "undue burden" is simply, and outrageously, false and never suggests an accommodation. The accommodation for tenured employees such as Plaintiff in this case could have been reassignment to his home until the temporary COVID mandate ended (in 2023).

The reason this was not offered? Defendant and the City of New York want to get rid of tenure, but they have been unsuccessful. That is the primary reason. By terminating anyone who could not , would not, or did not get the COVID vaccination by October 2021, was taken off of salary illegally, and then terminated without a hearing. Martin Scheinman said this was not disciplinary,

19

yet this was never supported by any evidence. No explanation about how this was not disciplinary has ever been given to the public. It is enough just for Martin Scheinman to say it is not disciplinary and everyone is supposed to go along with that. Here, the Defendant gave no document proving that the COVID Mandate was disciplinary or not. The CVM was a disciplinary policy, and every employee of the  DOE knew that to be true. See **Exhibit R**, MLC Letter dated August, 2021. But the DOE was in a quandary: how can we maintain our budget if students do not return to school after COVID? They must, they decided, reduce the number of employees and there was no time for a hearing.

 The Defendant abhors anyone who challenges them, and they are well known for retaliation. Control at all times is the name of the game which they have played successfully for more than two decades. The plan is to file a complaint against a tenured employee for any reason, reassign him or her to a rubber room reassignment with a problem code, then put the individual into a 3020-a hearing where the Defendant chooses the arbitrator and allows the arbitrator to get paid $1400/day if he or she terminates the employee. That's the deal. See:  **INSIDE 3020-a Teachers' Trials** (https://rubberroom3020-a.blogspot.com/). The fact that in this matter the Plaintiff was never reassigned and never allowed to keep his salary and never had a full 3020-a due process hearing makes this a calamity of major proportions. See Matter of Gould v Board of Educ., Sewanaka Cent. High Sch. Dist., 81 NY2d 446 (1993) (A tenured teacher has a protected property interest in the position and a right to retain it subject to being discharged for cause in accordance with the procedures set forth in the Education Law 3020-a). Tenure status implicates the Fifth Amendment: "Knick v. Township of Scott, 139 S. Ct. 2162 (2019)

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it. That does  not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. But it does mean that the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time."

The Motion must be denied in full.

## POINT V

### PLAINTIFF HAS STATED A CAUSE OF ACTION FOR SELECTIVE ENFORCEMENT

Defendant states in their Motion that:

"To succeed on a selective enforcement claim pursuant to § 1983, a plaintiff must plead facts that establish (1) the plaintiff was treated differently from a similarly situated individual, and (2) that the "treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Martin Scheinman made up that LWOP was not disciplinary, but it was, and this was no

secret. In August 2021 Harry Nespoli, Chair of the Municipal Labor Committee, sent out a  letter

to Deputy Mayor Dean Fuleihan, Deputy Mayor Emma Wolfe, and Renee Campion,

Commissioner of the New York City Office of Labor Relations saying that

"The MLC and Its leaders …will not abdicate their legal right and responsibility to protect the rights of workers to opt for either vaccination or testing, to be held harmless for both the time and cost of testing and vaccination, and to have a fair process for any form of discipline. Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criteria and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under collective bargaining agreements and law." See **Exhibit P**, attached.

Defendant ignored Mr. Nespoli's plea.Defendant also argues in the Motion that the Department's

terms of employment were changed to accommodate the COVID pandemic, and allegedly keep

the children safe. This was never a fact, and never put into law. As the Defendant mentions in the

Motion, Healthcare workers' employment was changed so that all healthcare workers had to be

vaccinated in order to work. This makes sense, because whenever a person works with sick

people, it is very probable that the patient has, could have or did have, COVID. But teachers'

terms of employment were never changed.

21

The closest the Defendant came to changing Plaintiff's terms of employment (which never

happened) might be in March, 2020, when the General Counsel for the UFT Beth Norton and

General Counsel for the DOE Howard Friedman signed a Memorandum of Understanding

(MOU) wherein they agreed to:

"1. Any modifications to the terms and conditions of employment for UFT members, and all
processes set forth the in the collective bargaining agreements, or any other agreements,
that are made in relation to the COVID-19 pandemic and the DOE response thereto have
been agreed to as a precautionary measure in response to the global emergency and to
ensure the safety of staff and to preserve the continuity of learning for the students of New
York City to the greatest extent possible.
2. Any such modifications shall not be precedential.
3. The parties may agree to rescind or alter any such modifications as COVID-19 circumstances
change, or as otherwise necessary or appropriate."

And more. See **Exhibit Q**, p. 2.

There are many problems with this MOU, aside from it being the only document that suggested

new terms of employment for Department employees such as Plaintiff (but this never became

law). This MOU was never seen by UFT members and never voted upon (ratified). Therefore,

the Defendant has no valid basis to claim that the terms of employment of its employees were

changed to accommodate COVID infections. No terms of employment were ever changed, and

as Plaintiff wrote in his Complaint (pp. 12-14), no changes may be made to his Tenure due

process rights, and the protections given cannot be waived. Only the State Legislature can do that

with a vote of the majority. The Legislature never changed the employment terms for tenured

teachers, even after the Mayor took control in 2002.

The Defendant needed to get the UFT and its' members to "agree" to do nothing when members

were disciplined and then terminated without their rights to a due process hearing. (**Exhibit N**.)

The basis for all policies concerning employment, Defendants seem to claim, is to be ready to

punish anyone who challenges whatever mandates or rules the Department decides to

implement.It is evident that more than 100 employees of the Department did, indeed, get their religious exemptions. See **Exhibits F., L**.

Consider the Executive Orders the Mayor issues. In New York City, the Mayor is in charge of the Department of Education, therefore this Complaint is against the Defendant = the City and Department. Take Executive Order 62 for example. This order said in relevant part:

3) "Covered worker" means an individual who works in-person in the presence of another worker or a member of the public at a workplace in New York City. "Covered worker" includes a full- or part-time staff member, employer, employee, intern, volunteer, or contractor of a covered entity, as well as a self-employed individual or a sole practitioner.... "Covered worker" does not include:

(i)  an individual who works from their own home and whose employment does not involve interacting in-person with co-workers or members of the public;

(ii)  an individual who enters the workplace for a quick and limited purpose;

(iii) a performing artist, or an individual accompanying such performing artist, while the performing artist is in a covered premises for the purpose of such artist's performance; or

(iv) a professional athlete, or an individual accompanying such professional athlete or such athlete's sports team, who enters a covered premises as part of their regular employment.

Also, make note of the fact that school delivery people and school bus drivers were allowed to work without getting vaccinated during the worst of the pandemic. This makes no sense except that Mayor Adams helped groups to which he owed favors, or was particularly interested in, and did not help tenured teachers. This is selective enforcement. POINT IV must be dismissed.

## POINT VI

### PLAINTIFF'S COMPLAINT PROPERLY PLEADS A FIRST AMENDMENT RETALIATION CLAIM

See Plaintiff's argument in POINT III, and pp. 12-14 in Plaintiff's Complaint on the tenure

protected rights and the Education Law §§ 3020 and 3020-a. To set forth a prima facie case for
First Amendment retaliation under Section 1983, Plaintiff must allege that (1) his right to his
religious beliefs were denied to him; (2) he suffered an adverse employment action; and (3) a
causal relationship between the two existed in that his religion/religious beliefs was a substantial
or motivating factor for the adverse employment action. Gronowski v. Spencer, 424 F.3d 285 (2d
Cir. 2005). Plaintiff properly made those allegations in his Complaint.

In deciding a motion to dismiss, the Court is generally confined to "the allegations contained
within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67,
71 (2d Cir. 1998). However, the Court may consider "any written instrument attached to [the
complaint] as an exhibit, materials incorporated in it by reference, and documents that, although
not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d
Cir. 2004) (internal quotation marks and citation omitted); see also Chambers v. Time Warner,
Inc., 282 F.3d 147, 153 (2d Cir. 2002) (observing that a document is "integral" if the complaint
"relies heavily upon its terms and effect") (internal quotation marks and citation omitted).
Plaintiff demonstrated in his Complaint that he engaged in speech protected by the First
Amendment, namely discussing his religious beliefs, that he suffered an adverse employment
action, and that a causal connection between the two existed, "in that the speech [about his
religion] was a substantial or motivating factor for the adverse employment action." Burkybile v.
Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d. Cir. 2005).
The threshold inquiry in any First Amendment retaliation case is whether the employee was
speaking as a citizen on a matter of public concern. Woodlock v. Orange Ulster B.O.C.E.S., 281
F. App 'x 66, 68 (2d. Cir. 2008) (quoting Garcetti v Ceballos, 547 U.S. 410, 418 (2006)).
Plaintiff's speech is constitutionally protected if he was speaking both (1) as a citizen rather than

pursuant to his employment duties, and (2) on a matter of public concern. Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 205 (E.D.N.Y. 2009) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). He was and is protected.

On a motion to dismiss, a reasonable inference of a causal connection is all that is required. See Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999) ("[T]he plaintiffs pleading need not clearly establish that the Defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect."); Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001). This "can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). A court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of [each] particular case [ ]," Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009). Where a Plaintiff asserts enough direct evidence of retaliatory animus to create a triable question of fact on the issue of a causal connection as here, a longer lapse between the protected speech and the adverse employment action Defendants not necessarily "conclusively establish lack of causation." See Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003).

Reading the complaint broadly and drawing all reasonable inferences in Plaintiff's favor, the complaint alleges sufficient facts to state a plausible claim for retaliation.

## POINT IV

### PLAINTIFF HAS ADEQUATELY PLED A STIGMA PLUS CLAIM AND FRAUD IN THE INDUCEMENT

Defendant committed fraud on the employees who applied for religious exemptions starting in 2020, when the Defendant made a secret deal with the UFT to change the terms of employment

as well as the articles in the contract (CBA) for employees without these issues ever being brought to any employee, including Plaintiff. (**Exhibit Q).** Defendant then gave, reluctantly, false hope to more than 1000 employees as they were told they could apply for religious exemptions from first the Scheinman SAMS Arbitrators, and then the Citywide Panel. Both Panels were bogus in terms of state and Federal Law. Denials were pre-set and pre-textual..

Additionally, Scheinman's September 10 2021 Award was a fraud because he wrote that LWOP, the wholesale, unilateral suspension on October 4, 2021 of tenured and untenured educators who could not/did not/would not get the COVID vaccine, was "not" disciplinary, but it most certainly was disciplinary because of the very secret placement of all unvaccinated employees onto the problem code. See **Exhibits J**. Karen King email; **K** Betsy Combier's Declaration and Eric Amato's email; **L**. UI denials due to "misconduct";  **S**, PERB Case U-32479. Furthermore, Defendant is deliberately misleading when they insisted that the Problem Code is not available to anyone outside the DOE. It most certainly is. See:

**The New York City Department of Education's "Problem Code" is an Unlawful Flag on an Employee's Fingerprints**, Parentadvocates.org,
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8884
**In NYC the Absent Teacher Reserve and The Rubber Room Are Both Strategies For Unlawful Denial of Tenure Job Protections**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8958
**The Problem Code, Fingerprints, The FBI, and the COVID Mandate**
**NYC Rubber Room Reporter, February 12, 2023**
https://nycrubberroomreporter.blogspot.com/2023/02/the-problem-code-and-covid-mandate.html
**The Hidden Rubber Rooms of New York City Create a Fiscal Nightmare**
https://nycrubberroomreporter.blogspot.com/2020/08/the-hidden-rubber-rooms-of-new-york.html

and **Exhibit T:** Attorney Black on Mallory Sullivan.

## CONCLUSION

Where a property right in continued employment exists, such as New York State's tenure system, the recipient of such a right may not be deprived without due process. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985]. Plaintiff has successfully pled in his Complaint that the

NYCDOE failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiff on the basis of his religion, unlawfully discriminating against the Plaintiff in the terms and conditions of his employment on the basis of his religion, in violation of Education Law §3020, §3020-a, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a substantive due process claim. The very idea that a person's livelihood through tenure, which is supposed to be determined through a fair evaluation of an educator's job performance, is denied in open and blatant retaliation for requesting an accommodation – i.e. a "rubber room" or home assignment during the pandemic after not getting the COVID vaccine - is outrageous and unconstitutional in the widest sense. There is no reasonable interpretation of the actions by Defendant alleged within the Complaint that could or should be excused as negligence or mistake.

Plaintiff's termination was pre-planned and part of a strategy to deny state and Federal laws and rights to certain tenured employees of the Department.. Even if such a definition is up for debate, it is inapplicable in a motion to dismiss stage and a simple reading of the Complaint amply demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of action to continue through to discovery as a matter of law.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant for all compensatory, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court dismiss the Defendant's Motion To Dismiss in its entirety, and grant Plaintiff any other relief to which he is entitled, including but not limited to:

1. Awarding Plaintiff his tenured position and salary given to him before his termination in full, with benefits; and

2. Awarding Plaintiff all the backpay and financial damages that ensued after he was placed on a lawless and unconstitutional Leave Without Pay;

3. Granting such other and further relief that the Court seems just and proper.

Dated: August 11, 2024

/s/*Christopher Fugelsang*
Christopher Fugelsang
