*** Filed ***
01:59 PM, 30 May, 2025
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
—————————————————————————x

**CHRISTOPHER FUGELSANG,**

                          Plaintiff          **DOCKET NO. 23-cv-8332(LDH)(RML)**


                -against-

                                        **AMENDED COMPLAINT**

                                           *Jury Trial Demanded*

**THE DEPARTMENT OF EDUCATION OF**
**THE CITY OF NEW YORK,**


                          Defendant

—————————————————————————x


**PLAINTIFF CHRISTOPHER FUGELSANG**, ("Plaintiff") proceeding Pro Se, as and for his

Summons and Complaint filed to protect his Constitutional rights against the above-captioned

Defendant **DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK** (henceforth

"Defendant") alleges upon knowledge as to his own facts and upon information and belief as to

all other matters:

### PRELIMINARY STATEMENT

1. This is a civil action seeking  injunctive relief, monetary relief, including past and on

   going economic loss, compensatory and equitable damages for the deprivation of

   Constitutionally protected rights given to him as a tenured teacher under Education Law

   §§3020 and 3020-a, Title VII (42 U.S.C. 2000e et seq.) and the New York City

Administrative Code §8-107, the Human Rights Law (NYCHRL), which prevent employers from discriminating against employees based on an employee's religious beliefs.

2. Plaintiff brings this action under 42 U.S.C. § 1983; due process guaranteed under the Free Exercise Clause, First, Fifth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 2000e, et seq.; religious discrimination and retaliation; and New York City Human Rights Law §296 which prevent employers from discriminating against employees based on an employee's religious beliefs and refusing to, or neglecting to, prevent such deprivations and denials to Plaintiff.

3. Defendant failed to accommodate Plaintiff's sincerely held religious beliefs which forbade him from getting vaccinated and then flagged his personnel file with a Problem Code which blocked him from employment and labelled him guilty of misconduct. By placing Plaintiff's fingerprints into a "problem code" or no-hire database, LWOP became a disciplinary action, with a charge of misconduct/insubordination due to Plaintiff holding onto his religious beliefs and refusing the vaccine. These actions by Defendants may clearly be defined as disciplinary retaliation, motivated by an intent to harm.

4. As a result, Plaintiff was terminated in March 2022 without just cause, without proper notice and without a due process hearing to particularize his religious exemption requests and Appeals.No hearing was given in this case.

5. Despite giving religious-based accommodations (RA) to more than 170 municipal employees similarly situated, and placing many unvaccinated employees on reassignment ("rubber rooms") in Defendants' district offices and at home on full salary, Defendants, acting at all times under color of law, did not grant Plaintiff's religious exemption/accommodation request ("RA"), offered no accommodation whatsoever, and

2

terminated him.

6. Defendants engaged in widespread religious discrimination in implementing its vaccine mandates by discarding due process rights outright for Plaintiff and not all others similarly situated, and adopting a facially discriminatory religious accommodation policy that conditioned an exemption on membership in a favored religion, or just gave no answer at all.

7. Defendants acting under color of law created the COVID Vaccine Mandate ("CVM") in order to terminate as many municipal workers as possible in a lawless manner and punish anyone who challenged their presumed total power. The goal was to fire municipal workers who had employment protections such as educators and Civil Service titles, which are soundly despised by the leaders of City politics.

8. Plaintiff seeks recovery of monetary damages for the violation of constitutional rights and due process enshrined in Federal Statutes and state law, including: (1) his backpay and all benefits and pension steps due after Defendant's violations of law, public policy and rights removed him from his salary and career in October 2021; (2)  judgment against Defendant for refusing to or neglecting to prevent such deprivations and denials to Plaintiff pursuant to Civil Service Law §75(b)(2)(a)(ii) and the Rights of Tenure; such other relief from the retaliation by Defendant after Plaintiff exercised his Constitutional rights to due process and freedom of religion and requested an accommodation so he could continue to work.

**PARTIES**

9. Plaintiff was a tenured special education teacher for the Department of Education of the City of New York in good standing since 2004. In 2014 Plaintiff moved overseas where he taught until 2019, when he returned to work at the Department. He had 13+ years working as a

teacher for the Department when he was terminated. As such, he had Constitutional rights, including protected liberty and property rights, to his position. He also worked with children who received Federal funds for their special services. At all times relevant herein, Plaintiff was a public employee of Defendants within the meaning of New York State Civil Service Law § 75 b(1)(b) and the Tenure Rights and Laws of New York State.

10. At all relevant times, the Defendant has overseen the NYC system of public schools located throughout all five (5) boroughs of the City of New York and been and continues to be a recipient of substantial federal funds, and as such, is subject to the mandates pursuant to City, State and Federal Laws including the First, Fifth and Fourteenth Amendments to the United States Constitution, which prohibit any diminution of human rights, discrimination, fraudulent misrepresentation of the nature and consequences of the COVID Vaccine Mandate ("CVM") and retaliation against individuals, such as Plaintiff herein.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(f)(3) et Seq. ("Title VII") and Plaintiff submits his Right To Sue letter from the Equal Employment Opportunity Commission (**EXHIBIT A**). This Action is hereby commenced prior to the expiration of the ninety (90) day window to file a claim pursuant to the Right to Sue Letter.

12. The Court has subject matter jurisdiction pursuant to 42 U.S.C. §1983 and §1988;  42 U.S.C. 2000e(f)(3) et Seq. ("Title VII");  and the First, Fifth and Fourteenth Amendments to the Constitution.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and 28 U.S.C 1343(2)(4); and 42 U.S.C. 1983, in particular the protections given by the Free Exercise Clause, First, Fifth and Fourteenth Amendments to the Constitution.

14. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a) and NYSHRL as well as state law pursuant to claims codified in the New York City Human Rights Law ("NYCHRL") as Administrative Code §§8-107(3)(a) and (b);  in that such claims are so related to Plaintiff's claims within the original jurisdiction of this Court that they form part of the same case or controversy.

15. This Court has pendant and supplemental jurisdiction over Plaintiff's state law and city law claims, as the facts that form the basis of the state and city law claims are substantially similar to the facts that form the basis of the federal law claims. Defendant was at all times acting under color of law in breaching the covenant of good will and fair dealing with the Plaintiff as well as committing fraud in the inducement.

16. Plaintiff filed a timely Notice of Claim but the Defendant has not made any attempt to resolve the issues contained therein. Charles EXHIBIT 2.

17. This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because the headquarters of the New York City Department of Education is located at 65 Court Street, Brooklyn, N.Y.

## STATEMENT OF FACTS

18. After the COVID-19 pandemic panic became a topic of concern in the fall of 2019, the City of New York started a process that was based upon an autocratic presumption of police power with widespread discrimination in implementing its vaccine mandates. However, while government is fully empowered to make emergency action against life-threatening

dangers, it is bedrock law in this country that constitutional rights and prohibitions do not change in an emergency. "The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency." Home Bldg. & Loan Ass'n v Blaisdell, 290 U.S. 398, 425 (1934).

19. Thus "even in a pandemic, the Constitution cannot be put away and forgotten." Roman Catholic Diocese of Brooklyn v Cuomo, 208 L.Ed. 2d 206, 210 (2020). A citizen has as his greatest right the inviolability of his person. Pratt v. Davis, 224 Ill. 300, 79 N.E. 562 (1903). Affirming the order for transfusions substituted judicial discretion for the individual's judgment. Application of President & Directors of Georgetown College, Inc., 331 F.2d 1000, 1013 (D.C. Cir. 1964), cert. denied 377 U.S. 978 (1964) (dissenting opinion).

20. On March 12, 2020 Mayor Bill de Blasio issued an Emergency Executive Order  declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents. Defendant DOE closed all schools within their jurisdiction in New York City in response to this threat. Plaintiff and most employees were sent home and worked remotely with Google Classroom and other IT software with their students.

21. On August 12, 2021 Harry Nespoli, Chairperson of the Municipal Labor Committee, wrote a letter to Renee Campion, Commissioner of the New York City Office of Labor Relations ("OLR") wherein Nespoli wrote about MLC's officers meeting with the City to negotiate working conditions for municipal employees who could not get the vaccine due to religious, medical, or other reasons. He also mentioned:

> "Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criterion and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under the collective bargaining agreements and law….no policy should be implemented

6

before it is negotiated."

Nespoli was aware of the secret negotiations going on behind the backs of municipal workers.

22. At the same time,  Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of COVID. https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. The hoax of the protection of the Vaccine against transmission and illness began to unravel.

23. On September 10, 2021 Arbitrator Martin Scheinman issued his Award to the UFT and the Defendant, writing that all NYC Department of Education (DOE) employees could request exceptions to the COVID mandate if they had medical conditions or religious beliefs that warranted their not getting vaccinated under certain restrictions made up by Scheinman and in conflict with Title VII protections. **EXHIBIT B** Scheinman Award September 10, 2021

24.  This was false information given by Mr. Scheinman. Upon information and belief, almost no one had their request granted.  The Defendant denied everyone without Review. Rodi testimony is posted in this article from Advocatz.com:

**The City of New York and the NYC Department of Education Never Intended on Honoring Requests For Religious Exemptions From Getting the COVID Vaccine By Municipal Workers**
https://advocatz.com/2025/05/28/the-city-of-new-york-and-the-nyc-department-of-education-never-intended-on-honoring-requests-for-religious-exemptions-from-getting-the-covid-vaccine-by-municipal-workers/

The subtitle is:

*"Their Lies About Honoring Title VII and Human Rights Laws Have Misled Court Judges and Created Permanent Harm To City Employees"*

And,

**The Citywide Panel and the Final Judgment in Kane-Keil-New Yorkers For Religious Liberty**
https://advocatz.com/2025/01/25/new-york-state-court-of-appeals-issues-an-amended-judgment-in-new-yorkers-for-religious-liberty-et-al-v/

25. On September 15, 2021 the Department of Health Commissioner Chokshi issued a new version of the COVID Vaccine Mandate (CVM) which gave permission to submit requests to remain working while unvaccinated. See ¶6, **EXHIBIT C**

26. Plaintiff submitted his Religious Exemption Request to the Panel on October 24, 2021 but was denied without any justification – only an"X" in the DENIED box. **EXHIBIT D and D1.**

27. Yet RF, an Assistant Principal with the DOE, submitted a Religious Exemption Letter and was granted an accommodation as an unvaccinated employee of the DOE: he became the administrator of the unvaccinated reassignment building at St. Brigid's School, where, he said, he checked people in and out every day. **EXHIBIT E.** RF Religious Exception Request Approved. The truth of the matter is that the DOE approved or denied Religious Appeals (RA) randomly and had no set criteria or standard and certainly did not comply with Title VII or Human Rights Law.

28. Additionally, the DOE made a false claim that the CVM made a change to the teachers' terms of employment. In 2021-2022, not a single union in the City agreed with, or ratified, a change of the terms and conditions in their contracts that agreed with the City's mandate to coerce their members into getting vaccinated or lose their jobs. Yet Defendants created an unconstitutional process made up by Arbitrator Scheinman, namely Leave Without Pay "LWOP" to disapprove every request for accommodation without changing the UFT-DOE Collective Bargaining Agreement ("BA") and the terms of employment detailed therein. **EXHIBIT F.** "LWOP".

8

29. In June 2022 Scheinman apologized for creating this unpaid forced leave, saying he thought it was the right thing to do at the time" and all DOE employees should have been given their due process hearing. **EXHIBIT G.** Scheinman Award June 27, 2022. Scheinman was too late to make a difference, as hundreds of DOE employees were already on food stamps, living with parents, or homeless.

30. The City clearly never gave a proper review to any submission for an exemption from getting the vaccine, yet stated in this very Court that they did give that review. Defendant used this false information and their power over the City budget and salaries as collateral, destroying the lives of thousands of honest, good workers and their families. Defendant acted under color of law to deny any accommodation for Plaintiff's protected right to his religious beliefs. Why was he denied and others approved? See **EXHIBITS H** and **H1**, where the City claims 148 received approvals, and in the case of Lucky v. Landmark Med. of Michigan, P.C., No. 23-2030, 2024 WL 2947920 (6th Cir. June 12, 2024) the Sixth Circuit joined multiple other circuits in clarifying that the government cannot second guess an applicant's interpretation of his creed.

31. But for the approval of the denial of this protected right by the Defendant, Plaintiff was maliciously and in bad faith terminated and stigmatized permanently by being placed on the Ineligible/Inquiry or "no hire" Problem Code List for relying on Defendant's misinformation. This was a secret held by the DOE until February 8, 2023 when New Yorkers For Religious Liberty (NYFRL) Attorney John Bursch gave oral argument at the Court of Appeals, and talked about the Declaration of Betsy Combier and the Problem Code email attached. **EXHIBIT I.** Declaration of Betsy Combier and Eric Amato email

32. On November 28 2021 the United States Court of Appeals for the Second Circuit found Scheinman's procedure "Constitutionally unsound", and set up a new hearing procedure under the Citywide Panel: "It is, of course, true that the citywide panel must abide by the First Amendment. By ordering the citywide panel's proceedings to abide by applicable law, the Motions Panel Order does not (and could not) suggest that the First Amendment is somehow inapplicable to those proceedings." It also reaffirmed that a fresh consideration of people's request for religious accommodation was required.. They wrote, "In addition to the First Amendment such consideration shall adhere to the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law." See **EXHIBIT J**, Court of Appeals Order.

33. Plaintiff submitted a request for an accommodation because of his religious beliefs to the Citywide Panel, and sent additional information on January 8 2022. He was denied an accommodation on March 7, 2022 because:

> "The decision classification for your appeal is as follows: The employee has failed to establish a sincerely held religious belief that precludes vaccination. DOE has demonstrated that it would be an undue hardship to grant accommodation to the employee given the need for a safe environment for in-person learning"
> **EXHIBIT K.**

34. On March 17, 2022 Plaintiff was notified by Defendant that he was terminated from his employment, although he had never had a due process hearing. **EXHIBIT L.**

35. Education Law 3020 and 3020-a forbid a terminated of a tenured teacher without a due process 3020-a arbitration hearing, and therefore the DOE violated Plaintiff's Constitutional rights and the 14th Amendment by not giving him a full and fair hearing on his religious beliefs turned into misconduct. **EXHIBIT L(1)** Rights of Tenured Teachers.

36. On March 13, 2023, after the COVID Mandate ended February 10, 2023, Plaintiff sent an email to Ms. Kathy Rodi, Executive Director of the Office of Employee Relations, asking her to respond to his previous request to be placed back on salary, be taken off of the "Problem Code" and reinstated. She did not respond.

37. Plaintiff was informed about the Problem Code on his fingerprints after the February 2023 Court of Appeals oral argument by John Bursch. His fingerprints were placed onto Defendant's Galaxy (budget) database used by the FBI and the Department of Labor Unemployment Board (UIAB). Anyone with the flag or Code on their fingerprints cannot get paid by the Defendants or any of the thousands of vendors working in the City of New York. This scarlet letter is extremely damaging to Plaintiff's career and character. The Declaration of Betsy Combier (EX. I) shows that this flag is not secret, but can be located by going to a personnel file and looking at the Salary History. See the following post on Parentadvocates.org:

**"The New York City Department of Education's "Problem Code" is an Unlawful Flag on an Employee's Fingerprints"**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8884

38. The Code is accessible by government agencies and principals, and UFT Representatives, among others. The label means that the individual has committed misconduct, and that Scheinman gave false information in his September 10 Award when he wrote that LWOP was not disciplinary. It was, and he knew it. But he did not want any tenured employee to receive charges and a hearing.

39. Plaintiff was denied a §3020-a due process hearing and given no accommodation whatsoever, despite the fact that the DOE has hundreds of employees throughout the City that either got the exemption from getting the vaccine or they were placed into a reassignment location at

home. In addition to these many DOE employees, school bus drivers, and school delivery people were given exemptions by the Mayor. Later, in March 2022, volunteers and Broadway actors as well as sports players were excluded from having to take the COVID Vaccine under the Mandate ("CVM"). See Emergency Executive Order 62 here:

https://www.nyc.gov/office-of-the-mayor/news/062-003/emergency-executive-order-62

40. The chaotic mess of the explosion of inequalities of law and vaccinations continue today. The New York Post highlighted the hundreds of employees who were getting exemptions:  City **Grants Vaccine Mandate Exemptions For Hundreds Of Public School Employees** https://gothamist.com/news/city-grants-vaccine-mandate-exemptions-hundreds-public-school -employees. Gothamist, Sept. 24, 2021.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION**
**TITLE VII RELIGIOUS DISCRIMINATION**

41. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 40 as if the same were fully set forth at length herein.

42. Plaintiff submitted to Defendant in October 2021 a statement on his sincere religious beliefs which forbade him from getting vaccinated with the COVID-19 vaccine. (Ex. D) He was denied, yet other teachers similarly situated were granted exemption/accommodations for their religious beliefs which prohibited getting vaccine.

43. Defendant has neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendant's invocation of "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendant's explicit religious discrimination. Additionally, the Defendant made false statements under color of law that Title VII was complied with when the religious Appeal was reviewed. This was untrue. See ¶20.

44. Defendant had knowledge of Plaintiff's sincerely-held religious beliefs yet chose to ignore these beliefs, forced him into a suspension without pay, denied his exemption request and Appeals based upon an unconstitutional ruling that cited "undue burden" without any further details or reason, and terminated his employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023 :

"The Court holds that showing "more than a de minimis cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. ….. What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test….. Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue." Bias or hostility to a religious practice or accommodation cannot supply a defense."

45. In Groff v. DeJoy, the U.S. Supreme Court clarified the standard for "undue hardship" under Title VII of the Civil Rights Act of 1964. The court ruled that employers must provide religious accommodations unless doing so would impose a substantial burden on their business operations, rather than just a de minimis (minor) burden. This decision, announced on June 29, 2023, has significant implications for religious accommodations in the workplace.

46. Defendant wrongfully, deliberately, in bad faith and under color of law attempted to fraudulently induce him to choose to relinquish his protected beliefs in order to submit to an experimental vaccine, and then punished him for not agreeing to this extortion and discrimination.

47. A government employer may not punish some employees, but not others, for the same activity, due only to differences in the employees' religious beliefs. Likewise, the government may not test the sincerity of an employee's religious beliefs by judging whether

13

his or her beliefs are doctrinally coherent or legitimate in the eyes of the government.  Nor may a government employer discriminate against religion by implementing policies that exempt employees for secular reasons more readily than religious ones.  All such discrimination violates the Free Exercise and Establishment Clauses of the First Amendment and the corresponding rights incorporated against the states by the Fourteenth Amendment. "When there is no plausible explanation for religious discrimination other than animus, it is subject to strict scrutiny, regardless of whether the government employer admits that its actions were motivated by hostility to certain religions." (JANE DOES et al., v BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO et al., No. 22-1027, U.S. Court of Appeals D.C. No. 1:21-CV-02637-RM-KMT., May 7, 2024). Defendant never gave Plaintiff's religious Appeal strict scrutiny.

48. In the new category of "insubordinate employee" and "unvaccinated", Plaintiff was not only removed unfairly and without due process from his job, but ostracized and humiliated by his peers both inside and outside of the workplace. He was discriminated against because of his religious beliefs.

49. Defendant started with suspension without pay, then secretly charged Plaintiff with misconduct/insubordination, falsely informed him that they had changed the terms of his employment when no change took place, flagged his files with a "Problem Code" without his knowledge or consent, and never gave him a hearing where he could clarify and particularize his reasons for not getting the COVID vaccination. The U.S. Supreme Court has ruled that this is retaliatory discrimination: Burlington Northern and Santa Fe Railway Company, 548 US 53 (2006) ("that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay").

50. But for the approval of the denial of protected rights by the Defendants, Plaintiff was maliciously and in bad faith harassed into leaving his job and stigmatized permanently by being placed on the Ineligible/Inquiry or "no hire" Problem Code List.

51. Defendant's deliberate targets were employees similarly situated as the Plaintiff here, who had high salaries and – worst of all – tenure. Tenure is public policy in New York State and gives, by law, Constitutionally protected property and liberty rights to continued employment. Defendant never liked this policy. Defendant wanted – and succeeded – in fraudulently harassing and discriminating against Plaintiff to get him out of his position quickly without due process. Their procedure, namely allowing Martin Scheinman to hold hearings where everyone would be denied their appeal, worked. Until November 28, 2021. (Ex. J).

52. On October 4, 2021 Plaintiff's fingerprints were given a flag/code known as a "Problem Code" and placed onto Defendant's Galaxy (budget) database used by the FBI and the Department of Labor Unemployment Board (UIAB). (**EX.** I Amato email.) Anyone with the flag or Code on their fingerprints cannot get paid by the Defendant or any of the thousands of vendors working in the City of New York. This scarlet letter is extremely damaging to Plaintiff's career and character. See ¶33. It is also publicly available.

53. The Code is accessible by government agencies and principals, and UFT Representatives, among others. The label means that the individual has committed misconduct, and that Scheinman gave false information in his September 10 Award when he wrote that LWOP was not disciplinary. It was, and he knew it. He wrote and negotiated the CBA for the UFT.

54. Based on the foregoing, Defendant under color of law subjected Plaintiff to discrimination on the basis of his religious beliefs, unlawfully discriminating against the Plaintiff in the terms

and conditions of his employment on the basis of his religion, in violation of his Constitutional rights to property, liberty and a due process 3020-a hearing, 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law), and N.Y.C. Human Rights Law.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR FAILURE TO REASONABLY ACCOMMODATE**
**THE PLAINTIFF'S SINCERELY HELD RELIGIOUS BELIEFS**

55. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 54 as if the same were fully set forth at length herein.

56. Plaintiff has sincerely held religious beliefs which forbid him from getting vaccinated with the COVID-19 vaccine.

57. Defendant had knowledge of Plaintiff's sincerely-held religious beliefs yet chose to ignore these beliefs, denied his exemption request and Appeals based upon an unconstitutional ruling that cited "undue burden" on the Department without any further details or reason, and terminated his employment.

58. No reasonable accommodation was offered to Plaintiff yet other employees of the Defendant received accommodations for their religious and/or medical accommodations.

59. At all relevant times Defendant knew that they had "rubber rooms" and reassignments to home as the new workplace for employees similarly removed from their positions in the Department:

**New Rubber Rooms Pop Up Throughout NYC To Warehouse Unvaccinated Employees Who have Won medical or Religious Exemptions**
https://nycrubberroomreporter.blogspot.com/2022/03/new-rubber-rooms-pop-up-throughout-nyc.html

and "rubber homes"

16

**Idled NYC educators do nothing but sign in remotely, even from Europe**
https://nypost.com/2023/01/14/idled-nyc-educators-do-nothing-but-sign-in-remotely-even-from-europe/

and at all times relevant the Defendant had ATRs, or Absent Teacher Reserve employees in

schools throughout New York City for whenever a teacher was ill or absent:

**The NYC Department of Education and UFT Lie About "Undue Burden" and Lack of Accommodations For the Unvaccinated**
https://nycrubberroomreporter.blogspot.com/2025/05/the-nyc-department-of-education-and-uft.html

60. Yet Defendant never engaged in a dialogue about Plaintiff's accommodation or reassignment.

This deprivation of a lawful procedure was intentional, acted on under color or law, and

pursued in bad faith.

61. Defendant claimed "undue burden" while simultaneously omitting information of their

long-term policy re-assigning employees to "rubber rooms", some of which held about

1-2000+ employees from 2002 until 2010. After 2010 Defendants scattered the re-assigned

employees who could not be near children to rooms throughout New York City. The

re-assigned employees not only were not told what they were guilty of, but were awaiting

charges of incompetency or misconduct for some act that may never have happened. A

problem code was put on these re-assigned employees when they were removed from their

classrooms and school. Some remained reassigned to the rubber room for more than 7-15

years. All reassigned personnel received their full salary and benefits while they waited for a

hearing unless they were removed from salary at a probable cause hearing. During the

pandemic, these re-assigned employees awaited their §3020-a hearings at home.

62. Defendant could have given all the so-called "miscreants" similarly unvaccinated as Plaintiff,

a reassignment to home or a rubber room. Defendants chose to claim that no accommodation

was available and any accommodation was an "undue burden". This lack of consideration directly contradicts the ruling in Groff.

63. Based on the foregoing, the NYCDOE failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiff on the basis of his religion, unlawfully discriminating against the Plaintiff in the terms and conditions of his employment on the basis of his religion, in violation of the Equal Protection of the Law contained within the 14th Amendment; 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

## AS AND FOR A THIRD CAUSE OF ACTION:
## VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

64. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 59 as if the same were fully set forth at length herein.

65. Defendant, while acting under the color of law, unlawfully deprived the Plaintiff of his right to Equal Protection of the Laws, guaranteed by the Fourteenth Amendment of the United States Constitution, in that they engaged in selective enforcement of their own laws, rules, regulations, and ordinances against Plaintiff based upon the Plaintiff's religion and Plaintiff's constitutionally protected conduct. In so doing, Defendants intentionally and, with malicious or bad faith intent to injure Plaintiff, selectively treated Plaintiff differently from other similarly situated employees and acted with no rational basis for the difference in treatment. Defendants' conduct was intentional, conducted with bad faith, and wholly irrational.

66. New York City was the only location in New York State which mandated the vaccine or termination for public employees. New York City was also the only place where tenured educators were suspended without pay and terminated without a 3020-a hearing. Every other

tenured educator in the State whether vaccinated or not, were given accommodations such as masks and testing. Anyone designated for charged misconduct received a 3020-a hearing. As a direct result of Defendant's violation of the Plaintiff's Fourteenth Amendment rights of equal protection, Plaintiff has suffered irreparable harm for which there is no adequate remedy of law.

67. Defendant's violation of Plaintiff's Fourteenth Amendment rights of equal protection under the law, as alleged herein above, Plaintiff has suffered and is entitled to recover compensatory and nominal damages including backpay.

68. Based on the foregoing, Defendants subjected Plaintiff to discrimination on the basis of his religious beliefs, unlawfully discriminating against the Plaintiff in the terms and conditions of his employment on the basis of his disabling condition, in violation of 42 U.S.C. § 1983; 14th Amendments due process clauses; Tenure rights and Law; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT TO DENY PLAINTIFF HIS PROPERTY AND LIBERTY RIGHTS TO A DUE PROCESS HEARING AS A TENURED TEACHER MANDATED BY EDUCATION LAW 3020 AND 3020-A**

69. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 64 as if the same were fully set forth at length herein.

70. Plaintiff was punished with wrongfully being terminated for his "insubordination" in not getting vaccinated with the COVID vaccine

71. Education Law Section 3020 , Chapter 16, Title 4, Article 61 states as follows:

"Discipline of teachers. 1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment

except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article" **EXHIBIT L(1)**

72. Plaintiff did not, at any time, waive his rights to a 3020-a hearing on his religious exemption request. He wanted his due process to be honored. Instead, he was declared insubordinate by the Department, his personnel file was flagged and his fingerprints tagged with a with a "Problem Code" designating misconduct and put into the same database used by the FBI without a hearing or due process.

73. The United States Supreme Court has defined waiver as "an intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304 U. S. 458, 464 (1938). Courts should "indulge every reasonable presumption against waiver,  Aetna Ins. Co. v. Kennedy, 301 U. S. 389, 393 (1937), and they should "not presume acquiescence 526*526 in the loss of fundamental rights," Ohio Bell Tel. Co. v. Public Utilities Comm'n,301 U. S. 292, 307 (1937). In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held: "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." Id., at 516.

74. Additionally, a waiver of a teacher's tenure rights must be knowingly and freely given (Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446; Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450).

75. Tenured teachers have a property and liberty right to their jobs, and therefore when there is any penalty that reduces the benefits of these rights, there must be Just Cause. Judge Desmond Green in the Richmond County Supreme Court  ruled in the case of Rosalie Cardinale that:

"New York State created the public school tenure system guaranteeing continued employment to tenured teachers by statute and therefore created a property right in a tenured teacher's continued employment. (See Education Law§§§ 3012, 3012- a, 3020, Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981], Matter of Abromovich v. Board of Educ. of Cent. School Dist. No. I of Towns of Brookhaven & Smithtown, 46 NY2d 450 [1979]). Where a property right in continued employment exists, such as New York's tenure system, the recipient of such a right may not be deprived without due process. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement ... " Education Law § 3020."

See also **EXHIBIT G.** Scheinman's Award June 27, 2022.

76. Based on the foregoing, the NYCDOE failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiff on the basis of his religion, unlawfully discriminating against the Plaintiff in the terms and conditions of his employment on the basis of his religion, in violation of  Education Law §3020, §3020-a, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for all compensatory, emotional, psychological and punitive damages, injunctive relief, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court grant Plaintiff any other relief to which he is entitled, including but not limited to:

1.    Awarding Plaintiff his tenured position and salary given to him before October 2021, in full, with benefits; and

2.      Awarding Plaintiff all the backpay that ensued after he was placed on a

Leave Without Pay;

3.      Granting such other and further relief that the Court seems just and

proper.

Dated: May 29, 2025

/s/Christopher Fugelsang
Christopher Fugelsang



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**San Juan Local Office**
525 F.D. Roosevelt Ave
Plaza Las Americas, Suite 1202
San Juan, PR 00918
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/11/2023

**To:** Mr. Christopher Fugelsang
216 Beach Breeze Place Apt 2
ARVERNE, NY 11692

Charge No: 520-2021-04900

EEOC Representative and email:      LUIS CALZADA
Investigator
luis.calzada@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally signed by William R. Sanchez
Date: 2023.08.11 15:38:32 -04'00'

William R. Sanchez
Director

**Cc:**
Laura Berman
NYC Department of Education
52 Chambers Street, Room 308
New York, NY 10007


Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request

Enclosure with EEOC Notice of Closure and Rights (01/22)

identifying your request as a "FOIA Request" for Charge Number 520-2021-04900 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2021-04900 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

```
-------------------------------- X
In the Matter of the Arbitration
                                  X
        between
                                  X
BOARD OF EDUCATION OF THE CITY              Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF    X
NEW YORK
                                  X
        "Department"
                                  X
        -and-
                                  X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO             X

        "Union"                   X

-------------------------------- X
```

**APPEARANCES**

    <u>**For the Department**</u>
     Renee Campion, Commissioner of Labor Relations
     Steven H. Banks, Esq., First Deputy Commissioner
     and General Counsel of Labor Relations

    <u>**For the Union**</u>
    STROOCK & STROOCK & LAVAN, L.L.P.
      Alan M. Klinger, Esq.

    Beth Norton, Esq., UFT General Counsel
    Michael Mulgrew, UFT President

**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

**BACKGROUND**

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning. They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters. In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits. This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

3

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

---

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

4

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

## Opinion

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

## I.   Exemption and Accommodation Requests & Appeal Process

As an alternative to any statutory reasonable accommodation

process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and non-pedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m.

    A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical

considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

o Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

9

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

10

arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an

11

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II. **Leave**

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

13

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

    i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

    ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

    iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

14

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v. In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child. As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi. If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

    vii.   All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

## III. **Separation**

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons.  An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

contained, herein, all parties retain all legal rights at all times relevant, herein.


September 10 , 2021.                    _____
                                       Martin F. Scheinman, Esq.
                                       Arbitrator



STATE OF NEW YORK         )
                          )    ss.:
COUNTY OF NASSAU          )


    I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September 10 , 2021.                    _____
                                       Martin F. Scheinman, Esq.
                                       Arbitrator


DOE.UFT.Impact Bargaining.awd

18

Case 1:23-cv-08332-LDH-LKE   Document 21-1   Filed 05/30/25   Page 45 of 98 PageID
#: 383

# ORDER OF THE COMMISSIONER
# OF HEALTH AND MENTAL HYGIENE
# TO REQUIRE COVID-19 VACCINATION FOR
# DEPARTMENT OF EDUCATION
# EMPLOYEES, CONTRACTORS, VISITORS, AND OTHERS

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends; and

**WHEREAS**, pursuant to Section 556 of the Charter and Section 3.01(c) of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS,** the CDC has recommended that school teachers and staff be "vaccinated as soon as possible" because vaccination is "the most critical strategy to help schools safely resume full operations [and] is the leading public health prevention strategy to end the COVID-19 pandemic;" and

**WHEREAS,** on September 9, 2021, President Joseph Biden announced that staff who work in Head Start programs and in schools run by the Bureau of Indian Affairs and Department of Defense will be required to be vaccinated in order to implement the CDC's recommendations; and

**WHEREAS**, on August 26, 2021, New York State Department of Health adopted emergency regulations requiring staff of inpatient hospitals and nursing homes to receive the first dose of a vaccine by September 27, 2021, and staff of diagnostic and treatment centers, hospices, home care and adult care facilities to receive the first dose of a vaccine by October 7, 2021; and

**WHEREAS,** Section 17-104 of the Administrative Code of the City of New York directs the Department to adopt prompt and effective measures to prevent the communication of infectious diseases such as COVID-19, and in accordance with Section 17-109(b), the Department may adopt

Case 1:23-cv-08332-LDH-LKE     Document 21-1     Filed 05/30/25     Page 46 of 98 PageID
#: 384

vaccination measures to effectively prevent the spread of communicable diseases; and

**WHEREAS,** the City is committed to safe, in-person learning in all pre-school to grade 12 schools, following public health science; and

**WHEREAS** the New York City Department of Education ("DOE") serves approximately 1 million students across the City, including students in the communities that have been disproportionately affected by the COVID-19 pandemic and students who are too young to be eligible to be vaccinated; and

**WHEREAS**, a system of vaccination for individuals working in school settings, including DOE buildings and charter school buildings, will potentially save lives, protect public health, and promote public safety; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section; and

**WHEREAS,** on August 24, 2021, I issued an order requiring COVID-19 vaccination for DOE employees, contractors, and others who work in-person in a DOE school setting or DOE building, which was amended on September 12, 2021; and

**WHEREAS**, unvaccinated visitors to public school settings could spread COVID-19 to students and such individuals are often present in public school settings and DOE buildings;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, to

**RESCIND and RESTATE** my September 12, 2021 Order relating to COVID-19 vaccination for DOE employees, contractors, visitors, and others; and

I hereby order that:

1. No later than September 27, 2021, or prior to beginning employment, the following individuals must provide proof of vaccination as described below:
   a. DOE staff must provide proof of vaccination to the DOE.
   b. City employees who work in-person in a DOE school setting, DOE building, or charter school setting must provide proof of vaccination to their employer.
   c. Staff of contractors of DOE or the City, as defined below, must provide proof of vaccination to their employer, or if self-employed, to the DOE.
   d. Staff of any charter school serving students up to grade 12, and staff of contractors hired by charter schools co-located in a DOE school setting to work in person in a DOE school setting or DOE building, must provide proof of vaccination to their employer, or if self-employed, to the contracting charter school.

Case 1:23-cv-08332-LDH-LKE   Document 21-1   Filed 05/30/25   Page 47 of 98 PageID #: 385

2. An employer to whom staff must submit proof of vaccination status, must securely maintain a record of such submission, either electronically or on paper, and must demonstrate proof of compliance with this Order, including making such records immediately available to the Department upon request.

3. Beginning September 13, 2021, all visitors to a DOE school building must show prior to entering the building that they have:
   a. Been fully vaccinated; or
   b. Received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
   c. Received the first dose of a two-dose vaccine.

4. Public meetings and hearings held in a DOE school building must offer individuals the opportunity to participate remotely in accordance with Part E of Chapter 417 of the Laws of 2021.

5. For the purposes of this Order:

"Charter school setting" means a building or portion of building where a charter school provides instruction to students in pre-kindergarten through grade 12 that is not collocated in a DOE building.

"DOE school setting" includes any indoor location where instruction is provided to DOE students in public school pre-kindergarten through grade 12, including but not limited to locations in DOE buildings, and including residences of students receiving home instruction and places where care for children is provided through DOE's LYFE program. DOE school settings include buildings where DOE and charter schools are co-located.

"DOE staff" means (i) full or part-time employees of the DOE, and (ii) DOE interns (including student teachers) and volunteers.

"Fully vaccinated" means at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine approved or authorized for use by the Food and Drug Administration or World Health Organization.

"Proof of vaccination" means proof that an individual:
   a. Has been fully vaccinated;
   b. Has received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
   c. Has received the first dose of a two-dose vaccine, in which case they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

"Staff of contractors of DOE or the City" means a full or part-time employee, intern or volunteer of a contractor of DOE or another City agency who works in-person in a DOE school

Christopher Fugelsang
14 Ocean Avenue
Rockaway Point, NY 11697

October 24, 2021

NYC Department of Education
65 Court Street
Brooklyn, NY 11201

**\*REVISED\***

To Whom it May Concern:

At the time of writing this letter, I have been an employee of the NYC Department of Education schools for more than 12 years. I have a wife, Catherine Fugelsang and a daughter, Simone Fugelsang, who is 8 years old.

In this letter I would like to share with you my sincere religious faith and how my practice of Catholicism and understanding of Christian teaching has led me to challenge vaccination. I will describe how I arrived at my interpretations. In my adult life, I have never received a vaccination and I continue to hold steadfast in my understanding of biblical and theological teaching on this matter.

I will be including the appropriate information from NY State regarding Religious Waivers to Immunizations. I believe it is illegal to be removed from my appointed position over my sincerely held religious beliefs **under Title 7 of the 1964 Civil Rights Act**.

I have notarized this application and letter. Therefore, I swear all of the contents of this letter are 100% true. NY State law allows an employee to refuse immunization based on a sincere and genuine personal religious belief.

The general public today is often extremely judgmental of people who hold strong religious convictions. Because of this I have felt that it is best to be very private about my beliefs and my decision to pursue a religious waiver. I ask that this application be kept 100% confidential as it contains thoughts and sentiments not shared with others in my workplace or the general public.

People have also been misled about the Catholic Church and vaccination. The media had misinterpreted Vatican comments purportedly showing support for

1

vaccination. Statements from the Vatican and Pontifical Academy for Life were also mere application guidelines. I can provide evidence for that (several pages long). School administrators in NYS must ignore the views of leaders of religious organizations, and instead evaluate the beliefs, and its support, proffered solely by the applicant. NY CLS Pub Health §2164(9) was amended in 1989, because the prior statute authorized schools to judge the correct interpretation of scripture by one cleric over another. See: Sherr and Levy v. Northport East-Northport Union Free School District, 672 F. Supp. 81
(E.D.N.Y. 1987).

Catholics who wish to refuse vaccines have a tenet of the Roman Catholic Church to justify it—Moral Conscience. Moral Conscience supersedes application guidelines, and it is reiterated in the opening pages of the Catechism, in which a letter signed by Pope John Paul II, reads that the book is a sure teaching norm of the faith—which makes it a rock solid tenet that must be obeyed. In fact, Liberty Counsel—a legal foundation in Florida which files lawsuits involving freedom of religion—had argued the Catechism's support of conscience to win its appeal in a religious exemption case in Arkansas, which cited immoral vaccines via aborted fetal cell lines.

This is the Catholic Church's actual position on vaccines:

https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html

Specifically, the Vatican says "*practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it **must be voluntary**…. Those who, however**, for reasons of conscience, refuse vaccines produced with cell lines from aborted fetuses**, must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent.*

As instructed in Catholic Doctrine, in Dignitas Humanae, Pope Paul VI wrote in 1965: "It is through his conscience that man sees and recognizes the demands of divine law. He is bound to follow this conscience faithfully in all his activity so that he may come to God, who is his last end."

Growing up in a devout and traditional Catholic family, these values were instilled in me at a young age. My father was a deacon in the Church and my mother, my 4 brothers and I attended mass on Sundays and on Holy Days. I was an altar boy and served with my father each week at the 8:30 AM mass at St. Agatha's Parish in Brooklyn, New York. I received all the required Sacraments. Concurrently, I attended elementary school at

St. Catherine of Alexandria from Grades 1-8. During this period of time, my family would come together several times a week to pray the Rosary, read scripture, and learn about

2

Catholic teachings. At school one of my favorite subjects was religion class. Because my family practiced our faith, in depth, at home, I was always confident in my ability to understand deep theological ideas and discuss them with my peers and teachers.

When I was 10 years old, a specific incident happened to me that solidified and deepened my personal relationship with God. I woke up in the middle of the night with a nosebleed as I often did at that age. I walked through the kitchen to inform my mother of the situation and on the way came face to face with a burglar! I was so frightened that I ran back into my room and lay in bed thinking my life would end that night. As I lay there bleeding, I prayed longer and harder than I ever had before and in that moment I realized my ability to have a direct and profound relationship with my Lord and to call on Him in a time of need. I laid in bed in incessant prayer for over 3 hours until my father awoke. That morning we discussed what had happened and prayed together. My parents lovingly helped me to process the traumatic event and we concluded that we must pray for the man who was so desperate to attempt to steal from us. In my classroom that day, during morning prayers, I requested a special intention for that man to change his sinful path and forgave him. That day, I was forever changed and committed to a life of prayer and spiritual discernment.

I continued on to Catholic High School (St. Edmund Prep, Brooklyn) where I spent four years, and chose above all other schools a Catholic College (Saint Anselm College, NH). During this time I continued to explore my faith and became close with many of my Catholic classmates and the Priests and Brothers of the Benedictine Order who lived on campus. I took courses in Biblical Theology, Christian Moral Life, & Christian Social Ethics which helped form my current beliefs on starting a family, raising children, and following a moral and righteous life in the teachings of the Church. During college is when I first felt the call to a Religious Vocation. I obtained the support of a Spiritual Director which led me on a path to several years of volunteer service and conversations with several different Religious Orders. My first volunteer trip was to the Juarez-El Paso border where we learned about the struggle of the migrant families and the difficult crisis at the border. The year after college I completed a full year Catholic Volunteer program called the Jesuit Volunteer Corps in Portland Oregon, where we lived out our Christian Values by practicing poverty, working with the disadvantaged, and living in community. This experience was also transformative in my spiritual growth and allowed me to challenge, explore, and solidify many of the beliefs I have been exposed to in my Catholic upbringing. As a result I was able to come into a stronger Faith in God than I ever had been previously.

As my volunteer year in Portland came to an end in 2003, I decided to return to my hometown of Brooklyn, NY to become a NYC School Teacher with the Teaching Fellows

3

program and continue in discernment to become a Catholic Priest. I believed that my work with children during this process would be giving back to the underprivileged children of my hometown and fulfilling my duty as a Christian, while simultaneously pursuing my vocation. My self-exploration brought me to the final stages of becoming a Maryknoll Missionary Priest. During this time I was also feeling called to a life of marriage and I wondered if God wanted me to have children. After another year of discernment, I came to the realization that joining a Religious Order was not what God had planned for me. I had developed a love for my job and began a relationship with someone I wanted to marry and started a family. I married my wife Catherine in 2009 and we had our only child, Simone who we are also raising in the Catholic Faith. Simone just received her First Communion this past May.

As a school teacher in NYC, I always felt that I was fulfilling a vocation, not just a career. My work with children has always been in direct alignment with my Catholic upbringing. In my classroom, I aim to create relationships and bonds with students encouraging them, above all else, to become individuals with strong moral character.

I think it's safe to say that my Catholic Faith has shaped who I am and has brought me to a greater understanding of a God I personally know. An all-powerful God of love, healing, acceptance and forgiveness.

**Turning Away From Vaccination**

My current beliefs continue to be highly influenced by my Catholic upbringing, however as I have grown in my faith, my beliefs have become more refined and traditional over the years and seem to misalign with some of the current stances taken by Catholic Religious leaders. I remain true to many of my Catholic fundamental core values, but I diverge in my sincerely held belief that abortion is murder and aborted fetal cells should never be used in medical procedures or their testing of medicines or vaccines.

I came to learn that many vaccines contain aborted fetal and animal cells when I had a conversation with my brother in December 2020, when the first doses of the COVID-19 Vaccine became available to the public. He informed me of this fact during a family gathering and presented some convincing arguments that shocked me and my other family members. Shortly thereafter, I decided to do some in depth research of my own. Below are some of the links to the information that I researched that prove this

information to be validated. After reading this, I decided that under no circumstance could I knowingly take a vaccine that uses aborted fetal cells. Doing so would put me in a state of grave sin and jeopardize my salvation.

https://cogforlife.org/wp-content/uploads/Abortion-Tainted-Vaccines.pdf 4


https://s27589.pcdn.co/wp-content/uploads/2020/12/CHART-Analysis-of-COVID-19-Vaccines-02June21.pdf

https://catholiccitizens.org/issues/abortion-stem-cells-derived-from/94529/verify-yes-johnson-johnson-used-aborted-fetal-cell-lines-in-its-creation-of-the-covid-19-vaccine/

https://www.gmp-creativebiolabs.com/per-c6-cell-lines_74.htm

These are heinous practices. These babies were alive when their organs were extracted.

https://www.catholiceducation.org/en/controversy/abortion/exploring-the-dark-world-of-vaccines-and-fetal-tissue-research-part-1.html

This practice is diametrically opposed to my core Catholic value system that by being vaccinated with any of the available COVID-19 vaccines, I would be cooperating with and complicit in abortion - the ending of an innocent human life - and that such would constitute a sin against God and a violation of His Commandments, for which I would be held morally accountable to God.

As a Catholic, I find it is my moral duty to uphold the traditions, customs, and principles that I, with my extensive Catholic training, see fit. I continue to pray each day that God guides me on the righteous path.

*"Show me the path where I should go, O Lord, show me the right road for me to walk."* Psalms 25:4

As in all prior experiences in my life, at times of uncertainty, I put my trust in God above all else. I believe God is showing me the path to walk on and I ask myself "who am I" to turn my back on his direction for me during these confusing times. With so much conflicting information from myriad sources, it is impossible to rely on anyone but God to show me the way.

**Your Bodies Are Temples Of The Holy Spirit**

I found online several medical sources which confirm that blood cell elements remain in all vaccines marketed in the US.

https://www.fda.gov/BiologicsBloodVaccines/ucm133705.htm
http://medcraveonline.com/IJVV/IJVV-04-00072.pdf
http://info.cmsri.org/the-driven-researcher-blog/dirty-vaccines-new-study-reveals
Prevalence-of-contaminants

5

https://www.cdc.gov/vaccines/pubs/pinkbook/downloads/appendices/b/excipient-table-2.pdf

That is why vaccination contradicts Christian teaching. Injecting these animal blood products directly into a person's body is a defilement. The Holy Spirit dwells in our body. This is a divine mystery and teaches us about our connectedness to God. "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies." (1 Corinthians 6:19-20) Because our human bodies are temples for the Holy Spirit, the way in which we care for our bodies is of the utmost importance. We must look to the bible on this matter, in which there is a lot of wisdom and guidance about the care of our bodies and the ways to keep our blood pure.

Blood has a very special place in the teachings of God. Blood is considered sacred and holy and is also considered to be "life" in the bible. The Bible tells us not to mix our blood with foreign blood. We have to keep our blood clean. "For the life of a creature is in the blood, and I have given it to you to make atonement for on the altar; it is the blood that makes atonement for one's life." (Leviticus 17:11) The relationship between "blood" and "life" is highlighted here and a parallel drawn between the pure and the impure, the sacred and the profane, the clean and polluted. Our blood must be kept pure for us to be in compliance with this teaching. Allowing our blood to be mixed with foreign blood cells is, therefore, not to be sanctioned.

"This is a lasting ordinance for the generations to come, where ever you live: you must not eat any fat or any blood." (Leviticus 3:17) Again here we see an order instructing us to keep our blood pure by refraining from taking "other" blood into our bodies. This again implies that our blood should not be contaminated by outside sources such as the blood of animals.

Mosaic Law or the system of laws that was given to Moses by God, is the law of life for all people. When reading this law, the key issue is that the blood of any creature must not be consumed, so it stands to reason that it may certainly not be injected directly into our bodies. Doing so is a joining of the unclean with the clean

sanctified blood, an act of pollution. There are no greater restrictions on unholy mixing than there are for blood. "You shall not eat anything with the blood: Neither shall you use enchantment, nor observe times." (Leviticus 19:26) This law is so serious that even non-Jews were not allowed to eat the blood. "Therefore, I have said to the people of Israel, No person among you shall eat blood, neither shall any stranger who sojourns among you eat blood." (Leviticus

6

17:12) Once again, this passage prohibits the consumption of blood, a theme that is repeated frequently in the Holy Scriptures. Additionally, no animals qualified as an exception to the law: "Moreover you shall eat no manner of blood, whether it be foul or of beast, in any of your dwellings." (Levitcus 7:26)

Another verse which speaks on this issue tells us "...since the life of every living body is in its blood, anyone who partakes of it shall be cut off." (Leviticus 17:14) This is a very clear direction from God to avoid this defilement of the blood, and speaks of the very dire consequences for disobeying. We are also told ..."to abstain from meat sacrificed to idols, from blood, from meats of strangled animals, and from unlawful marriage. If you keep from these, you will be doing what is right." (Acts 15:29) I feel that this last quote contains some very specific instructions on living your life in accordance with biblical teachings.

I would like to speak more about the issue of the sacredness of human blood, as I feel that it is vital to my beliefs. Human blood is sacred. The bible instructs us to keep our bodies pure and holy. "Follow God your Lord, remain in awe of him, keep his commandments, obey and serve him and you will then be able to cling to him. The physical body is the form which houses the lofty soul and therefore must also remain holy and pure and God would keep the body healthy without defilement, you must be holy, since I am God your Lord, and I am holy." (Leviticus 19:11)

That passage again refers to the physical body as the "house" or "temple" for the soul. Of course, if the body is the house, the blood is the life force that continuously circulates to bring purity and remove waste from the human body. Biblically, Human blood was to be kept pure under all circumstances and free of contaminants like animal parts and animal blood which would serve to pollute the soul's temple.

Hundreds of references to the sanctity of blood can be found throughout the Bible, not only in the Old Testament but in the New Testament as well. Blood, above all other parts of the body, is considered the most sacred. Blood was shed by Jesus Christ to atone for the sins of mankind and was spilled as a way to seal the covenants with God. "And he said to them, this is my blood of the covenant,

which is poured out for many." (Mark 14:24) Here blood is depicted as not only an element of sacredness but as a metaphor for the purification of sin. In the New Testament we see the topic of blood referenced often. Jesus Christ who is God in human form, has blood which is pure and can cleanse us of our sins. This is the miracle of Christ which was done for his followers. "How much

7

more, then, will the blood of Christ, who through the eternal Spirit offered himself unblemished to God, cleanse our consciences from acts that lead to death, so that we may serve the living God!" (Hebrews 9:14) It is with the coming of Christ that blood becomes a transformative element.

For Catholics the Eucharist is the Sacrament in which we consume the body and blood of Christ. It is His blood and His blood alone which cleanses us. The Eucharist sacrament strengthens and nourishes the faithful in mind and spirit as we eat the body and drink the blood of Christ. It is through the Eucharist that we become united with Christ through his humanity. "Whoever eats my flesh and drinks my blood remains in me and I in him. (John 6:56) We may achieve salvation through the body and blood of Christ.

Our Lord sacrificed his body and blood so that he might save our souls. Jesus' blood was untainted. Through Him with Him and in Him we may achieve salvation, and through His blood we may be reconciled with God the Father. This is why it is so important to keep our own blood pure. One of my favorite bible passages is the sharing of the first communion during the last supper, when Jesus ate his last meal with his apostles. During this special meal, Jesus said "Take this all of you and eat from it. This is my body which shall be given up to you. Take this all of you and drink from it. This is the cup of my blood, the blood of the new and everlasting covenant. It will be shed for you and for all so that sins may be forgiven. Do this in memory of me." (Matthew 26:23-24)

The human body, made in God's image, is perfect. I didn't know it at the time but this is what I was realizing when I was spending time with those small babies in Haiti. In their innocence their little bodies were the perfect temples of The Holy Spirit. We as human beings cannot improve upon what God has made. The Mrna vaccines insert a genetic code into our bodies. This is a code that we were not born with, a code that was not made by God.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mRNA.html?s_cid=11347:%2BmRNA%20%2Bvaccine:sem.b:p:RG:GM:gen:PTN:FY21

To accept this synthetic code is telling God that He did not make us perfectly, that we

need to be improved, and that science can do that. This is unacceptable to me because I do believe that everything God has made is indeed perfect.

The defilement of human blood is a dismissal of god as is clearly stated repeatedly in The Bible. Blood is the holiest component of our bodies and must remain free from impurities. This leads me to my second revelation about the sinfulness of

8

vaccination.

**You Cannot Worship Two Gods**

My research ultimately led me to one other issue with vaccination that makes it incompatible with my Faith in God. Vaccination is unique among medical procedures, in that it alters our precious blood in order to improve upon God's creation. The practice of vaccination presumes that God's perfect creation does not have the resources to deal with disease. Vaccinating a perfectly healthy child is rejecting God's wisdom and instead seeks refuge in modern medicine. In the Bible we are promised good health through living righteously in accordance with scripture. The prophylactic intervention of vaccination in a healthy individual is demonstrative of a lack of faith in God. It is also demonstrative of a lack of faith in His power. It is stated "And on the basis of faith in His name, it is the name of Jesus which has strengthened this man whom you see and know; and the faith which comes through Him has given Him this perfect health in the presence of you all." (Acts 3:16)

The Bible teaches us that there is a very close correlation between body and soul. In fact these two elements of our humanity are closely interrelated. What happens to one will affect the other. A sickness of the soul, such as sin, may manifest itself outwardly through sickness in the body. Belief in Christ is the foundation upon which we place our faith and have hope for protection from God in all aspects of our life. This includes maintaining good health. If, instead of our faith in Jesus Christ, we place our faith for good health in vaccination, then one does not have faith in God, but places his faith upon a manmade invention. Not in God's power. God did not make a mistake when creating us. He did not make us deficient. God's creation is perfect and does not need to be improved upon with vaccines to boost an inadequate or flawed immune system. "But as it is, God arranged the members in the body, each one of them, as he chose." (1 Corinthians 12:18)

Since God is omniscient, He knew that we would face illnesses and diseases. He equipped us with more than adequate bodies to live in this world including all it needs to function, fight infections, and build immunity. God's design is not to be

questioned and does not need man's improvements. "For who has known the mind of the Lord so as to instruct him?" (1 Corinthians 2:16)

Modern medicine makes the claim that vaccination is a "superior" protection capable of bestowing salvation over those who accept it. However, I believe that human beings are not capable of improving upon God's creation. We learn in the

9

bible that God is perfect. "So God created man in His own Image, in the Image of God He created him." (Genesis 1:27) Therefore, because God is perfect and we are created in his image, human beings are also perfect.

It sometimes feels that in our modern society doctors have taken the place of priests and medicine has replaced religion. People accept what their physicians say as gospel. These physicians tell us that everyone needs to be vaccinated in order to eradicate disease. The issue with this lies in the fact that medical science is a continually evolving field. Many of the medical practices of the past that were thought to be man's salvation have been debunked as new developments and findings replace the old ones. Ultimately the bible tells us to place our faith in the lord, and not in mankind. "That your faith should not be in the wisdom of men but in the power of God." (1 Corinthians 2:5)

I would like to return to a point I spoke on briefly, earlier. I have no problem with modern medicine in general. I have a personal general Practitioner, who I have been with for many years and for whom I have a vast amount of respect. His opinions and advice mean a great deal to me. The issue here, for me, lies in the fact that vaccination is different from other medical procedures. Vaccination, and not ordinary medical treatments permanently changes the composition of our blood, to repair what a perfect God "supposedly" could not accomplish on his own. I cannot accept that, and I believe that no person of faith could. Vaccination is quite different from taking medication for a fever or putting a cast on a broken limb as those interventions are attempting to return the body to its natural state, while vaccination is altering the body from the way that God made it.

Making the choice not to get vaccinated and to go against what mainstream society has deemed to be important has been a very difficult decision for my family, filled with stress and many sleepless nights. I've taken comfort in the following passage many times. "Whoever knows what is right to do and fails to do it, for him it is sin." (James 4:17) Sometimes we may have to follow a different path if we wish to walk in the footsteps of Christ.

Each night before we go to sleep, I pray with my daughter. I pray that she will be full of health, kindness, creativity, and that she will change this world for the better. When she sick, I make informed decisions about their health by seeking the medical advice of her pediatrician when necessary. My actions remain in line with my religious beliefs. At night I also pray for guidance from God. I seek His guidance in my decisions for the care of my family and myself in all areas of my life. I pray that my faith will guide my conscience and help me make

10

important choices. I seek God's will in accordance with his law. Getting vaccinated would be compromising my relationship with the Lord. "He who acts against his conscience loses his soul." (Fourth Lateran Council, 1215)

My life is blessed. I have a wonderful family and job that fulfills me in so many ways. It has become very clear to me that vaccination runs counter to the principles of Christianity, and to allow it would be a breach of my faith. As Catholics, we have been delegated an authority over our own bodies by God and we must exercise it as we see fit.

Not all Catholics will agree with me, but that doesn't make me any less a Catholic. This bishop also disagrees with the church's position. He isn't being excommunicated. I am just as much a Catholic as he is.

https://catholiccitizens.org/issues/church-state-relations/93628/bishop-schneider-on-covi d-vaccines-the-ends-cannot-justify-the-means/

I would like to end this letter by assuring you that these beliefs are of a real and very sincere nature. I am respectfully requesting that you grant me an exemption from vaccination and allow me to continue my employment in the NYC Department of Education.

Sincerely,

Christopher Fugelsang

11

**September 13th, 2021**

**To whom it may concern,**

**My name is R    F.       , my employee ID is #....... I have been employed with the NYCDOE for 20 years now. I am extremely proud of all the work I've done with the communities of the Bronx that I've had the privilege of working with. I am currently an Assistant Principal with Frederick Douglas Academy V in the Bronx.**

<u>**"Religious liberty is a foundational principle of enduring importance in America enshrined in our Constitution and other sources of Federal law."**</u>  I know that the law in this Country allows for personal religious beliefs and that's what makes me so proud to be an American, where my beliefs and freedoms are protected.  I get to work in a city that is literally called the Melting Pot of the Country.  It is filled with all different cultures and religions and we can live together respecting and encouraging one another's differences.

My faith, and religious journey is the most important thing in my life.  I am a devout Christian; my life is led by the Holy Spirit that lives inside of me.  It is my religious belief that my God is my healer and I put all my faith and hope in Him.  It is my religious belief that it is a complete betrayal of faith to put my hope and faith in any vaccine to keep my body healthy.  My God will heal me and my family.  We have all contracted covid and He kept us all, safe and whole.

Any blood that may be in any vaccines is sacrilegious and I cannot allow my body to be corrupted or made unclean.  1 Corinthians 3:17 "If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple".  Exodus 15:26 "I am the Lord that heals you." Fetal cells that may be used in creating this vaccine, goes against my stance on abortion.  As a Christian I am against murder.  Exodus 20:13 "You shall not murder."  Therefore, taking this vaccine will desecrate my body.  Even though I have been fully vaccinated in my childhood, that choice was performed by the choices of my non-religious parents, whom I loved dearly.  As an adult, husband and father, I choose to live out my life through God's command from His Holy word, the Bible.

My faith and relationship in God are what helps guide my life and helps me discern what is needed to keep my body in line with the Word of God.  I am created in the image of God.  My body/blood is a sacred being and must remain pure in the sight of God.  Taking this vaccine or any other vaccine for that matter would go against everything I believe and base my life upon.

I ask that you please keep this confidential, I am only sharing these personal things so you could have a better understanding of my declination of this vaccine due to my religious beliefs.  Please understand my convictions.  Thank you for your time and consideration.

Sincerely,

R.    F

**From:** NYCDOE noreply@schools.nyc.gov
**Sent:** Tuesday, September 28, 2021 4:12 PM
**To:** Fugelsang Christophe CFugelsang2@schools.nyc.gov
**Subject:** DOE Vaccination Portal

Dear Colleague,

You are receiving this email because our records indicate that you have not yet used the **DOE Vaccination Portal** to submit proof that you have received at least one dose of a COVID-19vaccine, as required by the DOE's COVID-19 Vaccine Mandate. **The deadline to upload this information is 11:59pm on Friday, October 1.**

**If you fail to meet this deadline, you will be removed from payroll and placed on LeaveWithout Pay status (LWOP) beginning Monday, October 4,** unless you are on an approved vaccine exemption or leave, you will not receive compensation. Additionally you may not use annual leave, CAR or sick time in lieu of Leave Without Pay.

**In order to avoid being placed on LWOP status, you must use the DOE Vaccination Portal to upload your proof of vaccination no later than October 4.**

If you have an approved vaccine exemption, or an approved leave your status will be updated shortly. Employees in certain titles including substitutes will be placed in another inactive status, not a leave without pay.

For more information about where to get vaccinated, visit vaccinefinder.nyc.gov or call 877-VAX-4-NYC.

For the latest COVID-19 staffing updates, please visit the Coronavirus Staff Update InfoHub page.

If you encounter technical issues using the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online or calling 718-935-5100.

Sincerely,

DOE Vaccination Portal Team



June 27, 2022

**<u>Via E-Mail Only</u>**
Liz Vladeck, Esq.
New York City Department of Education
Office of the General Counsel
52 Chambers Street, Room 308
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

Michael Mulgrew, President
Beth Norton, Esq.
United Federation of Teachers
52 Broadway, 14th Floor
New York, NY 10004

**Re:    Board of Education of the City School District of the City of New York
and
United Federation of Teachers, Local 2, AFT, AFL-CIO
(Proof of Vaccination)**

Dear Counsel:

Enclosed please find my Opinion and Award in the above referenced matter.

I have also enclosed my bill for services rendered.

Thank you.

Sincerely,

Martin F. Scheinman

MFS/sk
NYCDOE.UFT.proof of vaccination.trans

```
--------------------------------- X
In the Matter of the Arbitration
                                   X
            between
                                   X     Re: Proof of
BOARD OF EDUCATION OF THE CITY           Vaccination
SCHOOL DISTRICT OF THE CITY OF     X
NEW YORK
                                   X
        "Department"
                                   X
        -and-
                                   X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO              X

        "Union"                    X

--------------------------------- X
```

**APPEARANCES**

**For the Department**
  Liz Vladeck, General Counsel

**For the Union**
STROOCK & STROOCK & LAVAN, L.L.P.
  Alan M. Klinger, Esq.

  Beth Norton, Esq., UFT General Counsel
  Michael Mulgrew, UFT President

**BEFORE:**  Martin F. Scheinman, Esq., Arbitrator

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 65 of 98 PageID #: 403

**BACKGROUND**

The Union protests the Department's decision to summarily place approximately eighty two (82) Department employees on leave without pay, with benefits, effective April 25, 2022. This action was based upon information the Department received from a separate investigative agency these employees' proof of COVID-19 vaccination was allegedly fraudulent. The Union contends the issue of whether the Department's action is proper and falls within the scope of my September 10, 2021, Award ("Award").

Most of the basic facts are not in dispute.

In July 2021, former Mayor de Blasio announced a "Vaccine-or-Test" mandate which required the City workforce, including the educators, to either be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021. Thereafter, on August 23, 2021, Mayor de Blasio and the New York City Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in Department buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto Department premises, would not be paid for work and would be at risk of loss of job and benefits.

2

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 66 of 98 PageID #: 404

This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021.  That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation.  Nor did it address matters of due process with regard to job and benefits protection.

The Union promptly sought to bargain the impact and implementation of the Vaccine Only mandate.  The parties had a number of discussions, but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters.  The Department did not challenge the statement of impasse and PERB appointed me to mediate the matters.  Mediation sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions.  Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved.  By agreement of the parties, the process moved to arbitration.  They asked I serve as arbitrator.

Arbitration sessions were then held.  On September 10, 2021, I issued an Award which set forth a detailed procedure to be followed in the cases of employees who sought an exemption to the Vaccination Mandate based on a medical condition or religious reasons.

Case 1:23-cv-08332-LDH-LKE   Document 21-1   Filed 05/30/25   Page 67 of 98 PageID #: 405

In accordance with the procedure set forth in my Award, employee requests for an exemption were initially submitted to the Department along with any supporting documentation. An employee wishing to appeal an adverse determination by the Department was given the opportunity to appear at a hearing before an impartial arbitrator who was authorized to render a final and binding decision. Approximately five hundred (500) appeals were determined by the arbitration process. Pending the arbitrator's decision, the employee could not be removed from the payroll.

On April 19, 2022, the Department informed approximately eight two (82) employees they were being placed on leave without pay, with benefits, effective April 25, 2022, based on allegations their proof of COVID-19 vaccination was fraudulent. The employees were told they could contact the Department if they believed the allegation they submitted fraudulent proof of vaccination was wrong. On April 21, 2022, the Union wrote the Department and demanded it rescind its decision to remove these employees from the payroll without the benefit of a due process hearing.

By letter dated April 22, 2022, the Department set forth its position placement of these employees on a leave without pay status did not constitute discipline, and, therefore, did not implicate the disciplinary procedures set forth in the Education Law or the parties' Collective Bargaining Agreement ("Agreement").

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 68 of 98 PageID #: 406

Thereafter, by letter dated May 3, 2022, the Union wrote to me requesting I take jurisdiction over this dispute. The Union cited to that portion of the Award which states "should either party have reason to believe the process set forth herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution".

By letter dated May 4, 2022, the Department wrote in opposition to the Union's May 3, 2022, letter. The Department stated it was in full compliance with my Award, as well as the Agreement and applicable law. The Department also insisted this matter was not properly before me.

On May 4, 2022, I conducted a conference call with the parties. At that time, each side was given the opportunity to argue their positions.

Thereafter, on May 6, 2022, the Union submitted further argument in support of its position. The Department responded in a letter dated May 10, 2022.

Upon my receipt of the parties' written submissions, I closed the record.

**DISCUSSION AND FINDINGS**

**The Issues:**

The basic issues to be decided are as follows:

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 69 of 98 PageID #: 407

1. Is the Department's decision to place the approximately eighty two (82) employees on leave without pay, with benefits, subject to my jurisdiction pursuant to the September 10, 2021, Award?

2. If so, what shall be the remedy?

## Position of the Parties

The Department insists the facts of circumstances regarding its placement of the eighty two (82) employees on leave without pay, with benefits, is not within my jurisdiction pursuant to the Award. According to the Department, the Award sets forth an expedited process to review Department employees' requests for exemptions and accommodations from the August 21, 2021, mandate to submit proof of COVID-19 vaccination by September 29, 2021. The Department maintains the requests for an exemption or accommodation were limited to medical and religious grounds. It contends no other issue is covered by the Award.

The Department contends it placed the employees on a leave without pay status as a result of the Department's receipt of information from a law enforcement agency the employees in question submitted fraudulent proof of vaccination in order to comply with Commissioner Chokshi's order which required vaccination of all Department staff.

According to the Department, the Courts have held compliance with the Commissioner Chokshi's Order is a "condition of

Case 1:23-cv-08332-LDH-LKE Document 21-1 Filed 05/30/25 Page 70 of 98 PageID
#: 408

employment". The Department maintains this situation is no
different to the Department's unilateral action against an
employee who is not certified. As such, the Department maintains
placing employees on leave without pay for failing to comply with
the Commissioner Chokshi's Order comports with applicable due
process procedures as long as notice is given, and the employee
has an opportunity to respond. In support of its position the
Department cites Broecker v. N.Y. Dep't of Educ., 21-CV-6387,
2022 WL 426113 at *7-8 (E.D.N.Y. Feb. 11, 2022); and N.Y. City
Mun. Labor Comm. V. City of New York, 151169/2022 (Sup. Ct. N.Y.
County Apr. 21, 2022).

The Department argues employees who are identified in
connection with a law enforcement investigation into the
submission of fraudulent vaccination cards are outside the scope
of the Award. Furthermore, the Department insists the Award's
reference to a party's failure to implement the process does not
apply to the facts and circumstances presented, here. According
to the Department, the language relied upon by the Union refers
specifically to the "administrative process for the review and
determination of requests for religious and medical exemptions to
the mandatory vaccination policy and accommodation requests where
the requested accommodation is the employee not appear at school".
The Department asserts since that process is not at issue, here,
the Union's claim is misplaced.

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 71 of 98 PageID #: 409

For the reasons set forth above, the Department contends the Union's request for relief pursuant to the Award must be denied.

The Union, on the other hand, argues the Department's decision to place these employees on leave without pay, with benefits, is predicated on the Award. It insists this matter is subject to my continued jurisdiction. The Union asserts the Agreement prohibits an employee from being removed from the payroll without establishing probable cause in a due process hearing. [1]

The Union maintains the Department's contention this situation is akin to the removal of an uncertified employee is misplaced. According to the Union, approval of certification is issued by the State. In addition, the Union insists an employee is either certified by the State or is not, there is no underlying question of fact to be determined. The Union asserts if an employee proves they have completed all of the necessary paperwork, but they are not yet certified, they will not be terminated.

The Union urges in this instance the Department made a unilateral decision to place the employees on leave, without pay, based solely on a communication from another agency the employees were not vaccinated. The Union contends the Department has no direct knowledge of whether that assertion is true or false.

---

[1] There are limited exceptions to this procedure which are inapposite.

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 72 of 98 PageID #: 410

According to the Union, the Department removed the employees from the payroll and subsequently allowed them to provide additional evidence they are vaccinated. The Union maintains as of May 6, 2022, employees who have contacted the Department asserting they have been placed on leave without pay in error have not received any response, yet they remain suspended without pay.

The Union asserts the only authority for the Department to place employees on leave without pay, with benefits, is the Award. It contends the Department is improperly invoking the Award, and the action cannot be taken until the dispute concerning their vaccination status is determined through the Award's stated process.

In short, the Union argues the Department's unilateral decision to place employees on leave without pay, with benefits, based on the communication from another agency the employees are not vaccinated falls within the jurisdiction of the Award.

## Opinion

Certain preliminary comments are appropriate. As an arbitrator my role is a limited one. In order for me to determine whether I can assert jurisdiction over the Department's actions as alleged by the Union, I am limited by the language of the Award. If the Award is clear, I must enforce it according to its plain meaning.

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 73 of 98 PageID
#: 411

With these principles in mind, I turn to the facts presented.

I find I have jurisdiction to consider this matter. While the Department claims its action is unconnected with the Award, it is the Award itself that created a new leave without pay. Absent the Award, the Department was without the authority to remove these employees from the payroll without providing a due process hearing.

Leave without pay is an unusual outcome. Yet, I decided it was appropriate for employees whose requests for a medical or religious exemption were denied. This is because such employees intentionally decided to disregard the mandate they be vaccinated by September 27, 2021, the date established by Commissioner Chokshi and Mayor de Blasio.

Implicit in such a designation of leave without pay is the individual failed to comply with the vaccine mandate. Here, there is a dispute whether the employees did or did not comply. Without that being assessed, or at least submitting evidence to show a high likelihood of non-compliance, the predicate for placing an employee on leave without pay does not exist.

The Department's decision to automatically place these employees on leave without pay is inconsistent with the language and underpinnings of my Award. Nothing in the Award grants the Department such use of leave without pay status.

10

Case 1:23-cv-08332-LDH-LKE     Document 21-1     Filed 05/30/25     Page 74 of 98 PageID #: 412

Based upon the above, I find the Department failed to properly implement the due process protections of my Award. The Union has the right to assert the Department's process "is not implemented in good faith." To be clear, nothing in my Award was intended to abrogate any due process rights the parties otherwise maintained with regard to employment status.

I also disagree with the Department's position the court decisions it cites support the removal of these employees from pay status without a hearing. Those court decisions confronted an entirely different factual scenario. Unlike this matter, in those cited cases, there was no claim the employees at issue were vaccinated.

In denying the request for a preliminary injunction, Justice Kim, in NYC Municipal Labor Committee, supra., specifically found the absence of that factual issue in her determination. Here, of course, the employees assert they are in fact vaccinated. This raises a factual issue that is ripe for adjudication pursuant to my Award.

Based on the reasons set forth above, I take jurisdiction over the Department's placement of the approximately eighty two (82) employees placed on leave without pay, with benefits. The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an

employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

Case 1:23-cv-08332-LDH-LKE    Document 21-1    Filed 05/30/25    Page 76 of 98 PageID #: 414

## AWARD

1.  Pursuant to Section 1L of my Award dated September 10, 2021, I shall assume jurisdiction over the Department's decision to place eighty two (82) employees on leave without pay, with benefits, effective April 25, 2022.

2.  The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.UFT.CHIARA.NAKASHIAN.AWD

# GIBSON LAW FIRM, PLLC

Sᴜᴊᴀᴛᴀ S. Gɪʙꜱᴏɴ, Eꜱᴏ.
120 E Buffalo St., Suite 2
Ithaca, New York 14850

June 24, 2024

**Via Electronic Filing**
Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for Second Circuit
40 Foley Square
New York, NY 20007

RE:  *New Yorkers for Religious Liberty v. The City of New York*
Case No. 22-1801 – 28(j), Supplemental Authority - Sixth
Circuit, *Lucky v. Landmark Med. Of Michigan, P.C.*

Dear Ms. O'Hagan Wolfe:

Plaintiffs-Appellants submit supplemental authority pursuant to
Rule 28(j). In *Lucky v. Landmark Med. of Michigan, P.C.,* No. 23-2030,
2024 WL 2947920 (6th Cir. June 12, 2024), the Sixth Circuit joined
multiple other circuits in clarifying that the government cannot second-
guess an applicant's interpretation of his creed.

Here, like in *Lucky*, the Citywide Panel rejected religious objections
grounded in prayer or religious conscience, acknowledging sincerity but
calling such beliefs "personal" not "religious." *See* App.Br. ECF No.114 at
56, 67-107. The Sixth Circuit rejected this unconstitutional approach,
holding that where a plaintiff stated that "she prayed, she received an
answer, she acted accordingly," plaintiff sufficiently asserted religious
objections to vaccination. 2024 WL 2947920, at *2.

The Citywide Panel's admitted policy of second-guessing employees'
interpretations of their own creeds not only violates Plaintiffs' Free
Exercise Rights, but also their Establishment Clause and Equal
Protection Clause rights. App.Br. ECF No. 114, Points II(B), III and IV.
Employers cannot avoid accommodating employees' religious practices by
narrowing the definition of religious. Here, the government did just that,

Tᴇʟᴇᴘʜᴏɴᴇ: (607) 327-4125                    Eᴍᴀɪʟ: ꜱᴜᴊᴀᴛᴀ@ɢɪʙꜱᴏɴꜰɪʀᴍ.ʟᴀᴡ

adopting a facially discriminatory written policy that made express classifications based on religion. Then, rather than attempt to mitigate the harm in good faith, the City continued to resolve theological questions and redefine disfavored beliefs as "non-religious" to get to the same result on remand.

The Sixth Circuit remonstrated the lower court in *Lucky* for doing the same: "'It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. And the Supreme Court has warned, repeatedly and in many different contexts" that government "must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." 2024 WL 2947920, at *2 (citations omitted).

Because of the immense, irreparable harm the City has inflicted on Plaintiffs, this Court granted expedited oral argument and heard this case on February 8, *2023*—more than 16 months ago. Plaintiffs deserve a ruling that brings this dispute within the overwhelming weight of circuit authority across the country.

Respectfully Submitted,

*/s/ Sujata S. Gibson*
Sujata S. Gibson
Co-Counsel for Plaintiffs-Appellants

cc: All counsel via ECF

2024 WL 2947920
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Najean LUCKY, Plaintiff-Appellant,

v.

LANDMARK MEDICAL OF
MICHIGAN, P.C., Defendant-Appellee.

No. 23-2030
|
Decided and Filed: June 12, 2024

**Synopsis**

**Background:** Non-denominational Christian job applicant,
who had not received COVID-19 vaccine, brought action
against employer, alleging religious discrimination under
Title VII. The United States District Court for the Eastern
District of Michigan, Bernard A. Friedman, J., 2023 WL
7095085, granted employer's motion to dismiss for failure to
state a claim. Applicant appealed.

**[Holding:]** The Court of Appeals, Kethledge, Circuit Judge,
held that applicant sufficiently alleged that her refusal to be
vaccinated against COVID-19 was aspect of her religious
observance or belief, so as to state claim for religious
discrimination.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (3)

**[1]** **Civil Rights** 🔑 Beliefs and activities
protected; sincerity

Non-denominational Christian job applicant
sufficiently alleged that her refusal to be
vaccinated against COVID-19 was aspect of her
religious observance or belief, so as to state claim
against employer for religious discrimination
under Title VII; applicant alleged that she
believed she should not have any vaccination
enter her body such that her body would be

defiled because her body was a temple, that she
sought to make all decisions through prayer, that
God spoke to her in her prayers and directed her
that it would be wrong to receive the COVID-19
vaccine, and that, as a result of her beliefs, she
refused to receive the vaccine. Civil Rights Act
of 1964 §§ 701, 703, 42 U.S.C.A. §§ 2000e(j),
2000e-2(a)(1).

**[2]** **Civil Rights** 🔑 Beliefs and activities
protected; sincerity

For purposes of religious discrimination claim
under Title VII, it is not within the judicial ken
to question the centrality of particular beliefs or
practices to a faith, or the validity of particular
litigants' interpretations of those creeds. Civil
Rights Act of 1964 § 703, 42 U.S.C.A. §
2000e-2(a)(1).

**[3]** **Evidence** 🔑 Prima facie evidence

Prima facie case is an evidentiary standard, not a
pleading requirement.

Appeal from the United States District Court for the Eastern
District of Michigan at Detroit. No. 2:23-cv-11004—Bernard
A. Friedman, District Judge.

**Attorneys and Law Firms**

ON BRIEF: Brendan J. Childress, HURWITZ LAW
PLLC, Ann Arbor, Michigan, for Appellant. Patricia
Pryor, JACKSON LEWIS P.C., Cincinnati, Ohio, Elyse K.
Culberson, JACKSON LEWIS P.C., Southfield, Michigan,
for Appellee.

Before: KETHLEDGE, LARSEN, and BLOOMEKATZ,
Circuit Judges.

**OPINION**

KETHLEDGE, Circuit Judge.

**\*1** Najean Lucky sued Landmark Medical of Michigan, P.C.,
asserting a claim of religious discrimination under Title VII.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 1

The district court dismissed her complaint for failure to state a claim. We reverse.

We take the allegations in Lucky's complaint as true. *Heyward v. Cooper*, 88 F.4th 648, 653 (6th Cir. 2023). Lucky is a non-denominational Christian who believes that she "should not have any vaccination enter her body such that her body would be defiled, because her body is a temple." Compl. ¶12. She also "seeks to make all decisions, especially those regarding vaccination and other medical decisions, through prayer." *Id.* ¶11. As relevant here, Lucky "prayed to God specifically about the COVID-19 vaccine" and says that God told her "that she would suffer spiritual harm if she received the COVID-19 vaccine." *Id.* ¶21. Lucky therefore has not received the vaccine.

Landmark provides in-home medical care. It recruited Lucky for a management position in February 2022. During an interview for that position, Landmark's interviewer, Betrice Lavender, at first "spoke positively" about Lucky's potential and "even discussed her starting salary." *Id.* ¶26. But Lavender asked whether Lucky had been vaccinated for Covid-19; Lucky said she had not, because of her religious beliefs. Lavender then "end[ed] the interview[,]" saying that she had rejected ten other candidates because they were unvaccinated for Covid, and that Landmark would not make any accommodations in that regard. *Id.* ¶¶30-32.

Lucky thereafter brought this suit, claiming that Landmark refused to hire her because of her religious beliefs, in violation of Title VII of the 1964 Civil Rights Act. The district court dismissed her complaint for failure to state a claim, stating that Lucky had not alleged that "her religion has a specific tenet or principle that does not permit her to be vaccinated." *Lucky v. Landmark Med. of Mich., P.C.*, No. 23-cv-11004, 2023 WL 7095085, at *7 (E.D. Mich. Oct. 26, 2023). Rather, the court said, Lucky had offered "only naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). Thus, the court concluded, Lucky had not alleged that Landmark discriminated against her based on her religion. We review that decision de novo. *Heyward*, 88 F.4th at 653.

Title VII provides in relevant part: "It shall be an unlawful employment practice for an employer ... [to] refuse to hire ... any individual ... because of such individual's ... religion[.]" 42 U.S.C. § 2000e-2(a)(1). The word "religion," in turn, "is defined to 'include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates

that" it cannot reasonably accommodate them. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-72, 135 S.Ct. 2028, 192 L.Ed.2d 35 (2015) (cleaned up and quoting 42 U.S.C. § 2000e(j)).

The question here, broadly stated, is whether Lucky pled particular facts supporting an inference that Landmark refused to hire her because of her "religion," as defined by the statute. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Hardwick v. 3M Company*, 87 F.4th 315, 320 (6th Cir. 2023). That Lucky made several of the requisite allegations is undisputed: she alleged that Landmark refused to hire her; that it did so because she had not received the Covid vaccine; and that it refused to provide her any accommodation regarding the vaccine. *See* Compl. ¶¶28-32, 39-40.

**\*2** **[1]** The remaining question is whether Lucky pled facts supporting an inference that her refusal to be vaccinated for Covid was an "aspect" of her "religious observance" or "practice" or "belief." 42 U.S.C. § 2000e(j). Plainly she pled such facts. Lucky pled that she is "a non-denominational Christian" who believes she "should not have any vaccination enter her body such that her body would be defiled, because her body is a temple." Compl. ¶¶10, 12. She also pled that she "seeks to make all decisions, especially those regarding vaccination and other medical decisions, through prayer." *Id.* ¶11. She pled further that—as to the Covid vaccine in particular—"God spoke to [her] in her prayers and directed her that it would be wrong to receive the COVID-19 vaccine." *Id.* ¶15. And she pled that, as a result of her beliefs, she refused to receive the vaccine. *Id.* ¶¶16, 19-21, 29.

Those are allegations of particular facts—she prayed, she received an answer, she acted accordingly—rather than what the district court called "naked assertions devoid of further factual enhancement." Moreover, she alleged that she has a religious objection to vaccines of any kind. *Id.* ¶12. No further "enhancement" was necessary: Lucky's allegations were almost self-evidently enough to establish, at the pleadings stage, that her refusal to receive the vaccine was an "aspect" of her religious observance or belief.

**[2]** Nor did the district court have any basis for its insistence that Lucky explain how "her religion has a specific tenet or principle that does not permit her to be vaccinated." Quite the contrary: "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those

creeds." *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). And the Supreme Court has warned, "[r]epeatedly and in many different contexts," that "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Employment Div. v. Smith,* 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The district court presumed such authority here. And Lucky's allegations would support an inference of religious conduct for a person of any faith.

**[3]** Landmark, for its part, principally argues that Lucky's pleadings do not establish a prima facie case of discrimination

under Title VII. But "the prima facie case is an evidentiary standard, not a pleading requirement." *Savel v. MetroHealth System,* 96 F.4th 932, 943 (6th Cir. 2024) (internal quotation marks omitted). Landmark's argument is inapposite here.

The district court's judgment is reversed, and the case is remanded for proceedings consistent with this opinion.

### All Citations

--- F.4th ----, 2024 WL 2947920

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.



**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

**T**HE **C**ITY OF **N**EW **Y**ORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**Andrea M. Martin**
*Assistant Corporation Counsel*
Telephone: (212) 356-3549
E-mail: andmarti@law.nyc.gov
*Email not for service*

May 17, 2024

**VIA ECF**
Magistrate Judge Sanket J. Bulsara
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  Masciarelli v. New York City Department of Education
22 Cv 7553 (CBA)(SJB)

Dear Magistrate Judge Bulsara:

I am an Assistant Corporation Counsel in the Office of the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, and attorney for Defendant in the above referenced action. I respectfully submit this joint letter, on behalf of both parties, to seek clarification concerning a court order issued during the April 2, 2024 status conference.

At the April 2 conference, Your Honor ordered Defendant to produce: "a spreadsheet listing, using some form of anonymous method—a the individuals who were – who sought a accommodation from the vaccine mandate from the period of of May 1st, 2021 through October 30th, 2023, an indication of whether, you know limited solely to those who sought a accommodation on the basis of religion, okay so it's not a medical one. Indicating whether or not they were given an accommodation, what the nature of the accommodation was, and whether the person indicated that they were Catholic or non-Catholic." See Exhibit 1, copy of the April 2, 2024 Court transcript, at page 14, lines 11-20.

Your Honor later explained, "I would expect the spreadsheet would include anyone who's had a religious exemption or accommodation. And I realize, you know, again anonymized in the nature of the accommodation." See Exhibit 1, copy of the April 2, 2024 Court transcript, at page 20, lines 4-7.

In accordance with the Court's April 2 Order, on May 7, 2024, Defendant produced an anonymized spreadsheet that shows: (1) all DOE individuals who were granted a religious

1

accommodation or exemption, (2) whether they were Catholic or non-Catholic, (3) and the nature of the granted accommodation.[1]

On May 14, 2024, Plaintiff advised Defendant that she believed Defendant's May 7th production was deficient.

First, the Plaintiff objected to the fact that the spreadsheet did not reflect all DOE individuals who sought a religious accommodation and only reflected the 148 employees who were granted accommodations.

Second, the Plaintiff object to the lack of specificity regarding the type of accommodation granted to the 148 employees. The Defendant's production only described the accommodation as "[a]ssignment in non-school location" and not whether that accommodation was working from home or at an office in the Defendant system, or otherwise. The Plaintiff seeks more specificity than offered by the Defendant.

The parties met and conferred, in good faith, about these issues on May 15, 2024, but have reached an impasse. Accordingly, the parties seek the Court's intervention to resolve whether the April 2 Order requires Defendants to produce an anonymized spreadsheet that shows all individuals who sought a religious accommodation as opposed to all individuals who were granted a religious exemption and must provide more specificity with respect to the type of accommodation granted to those granted accommodations.[2]

We appreciate Your Honor's attention to this matter.

Respectfully Submitted,
s/Andrea M. Martin
Assistant Corporation Counsel

cc:     Counsel of Record (by ECF)

---

[1] Should the Court require this spreadsheet, Defendant can submit a copy under seal for *in camera* review.

[2] To the extent the Court orders Defendant to produce a list of all DOE employees who sought a religious accommodation, whether granted or not and more specificity with respect to the type of accommodation that was granted, the Defendant estimates there are over 3,000 individuals who made such applications, and respectfully request an additional 4 weeks to produce this information.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X :
                                                                  :
MICHAEL KANE, et al.,                                             :
                                                                  :
                                      Plaintiffs,                 :
                                                                  :    Case No.  21-cv-7863 (VEC) (Lead)
                - against -                                        :
                                                                  :
DE BLASIO et al.,                                                 :
                                                                  :
                                      Defendants.                 :
-----------------------------------------------------------------X :
                                                                  :
MATTHEW KEIL, et al.                                              :
                                                                  :
                                      Plaintiffs,                 :
                                                                  :    Case No.  21-cv-8773 (VEC)
                - against -                                        :
                                                                  :
THE CITY OF NEW YORK et al.,                                      :
                                                                  :
                                      Defendants.                 :
-----------------------------------------------------------------X

### DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.     My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a
       paralegal consulting business for people who need a partner as they go through the
       Courts, grievances, or life problems.

2.     I respectfully submit this Declaration in support of Plaintiffs' Motion for a
       Preliminary Injunction.

3.     I know the facts stated herein to be true based upon my personal knowledge and
       based upon my review of the files of hundreds of my clients whom I have represented
       in proceedings with the New York City Department of Education ("DOE"), except

1

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

2

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.  When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10. I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes. The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11. I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12. I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

3

13.     Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.     I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.     The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.     Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.     At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.     Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

4

19.      I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20.      In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        June 3, 2022

By: Betsy Combier

# EXHIBIT A

From: **Amato Eric** <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To: ████████████████████████ Michael Sill <msill@uft.org>
Cc: Beth A. Norton <bnorton@uft.org>, Kking@uft.org <Kking@uft.org>, dcampbell@uft.org <dcampbell@uft.org>

PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.

Thanks,
Eric

## APPENDIX

# United States Court of Appeals
FOR THE
## SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand twenty-one.

Before:        Pierre N. Leval,
                José A. Cabranes,
                Denny Chin,
                    *Circuit Judges.*

---

Michael Kane, William Castro, Margaret Chu,
Heather Clark, Stephanie Di Capua, Robert Gladding,
Nwakaego Nwaifejokwu, Ingrid Romero, Trinidad
Smith, Amaryllis Ruiz-Toro,

                    *Plaintiffs-Appellants,*

        v.

Bill de Blasio, in his official capacity as Mayor of
the City of New York, David Chokshi, in his
official capacity of Health Commissioner of the
City of New York, New York City Department of
Education,

                    *Defendants-Appellees.*

---

Matthew Keil, John De Luca, Sasha Delgado,
Dennis Strk, Sarah Buzaglo,

                    *Plaintiffs-Appellants,*

        v.

The City of New York, Board of Education of the
City School District of New York, David Chokshi, in
his Official Capacity of Health Commissioner of the
City of New York, Meisha Porter, in her Official

**ORDER**

21-2678-cv

21-2711-cv

Capacity as Chancellor of the New York City
Department of Education,

*Defendants-Appellees.*

The motions of Plaintiffs-Appellants ("Plaintiffs") for an injunction pending appeal
having been heard at oral argument on November 10, 2021, and Defendants-Appellees
("Defendants") having represented to this Court that "the City is working toward making an
opportunity for reconsideration available more broadly to DOE employee[s] who unsuccessfully
sought religious exemptions pursuant to the arbitration award's appeal process," it is hereby

**ORDERED** that this appeal is expedited and will be heard by a merits panel sitting on
November 22, 2021 (the "merits panel"). Pending further order by the merits panel,

1. Plaintiffs shall receive fresh consideration of their requests for a religious
   accommodation by a central citywide panel consisting of representatives of the
   Department of Citywide Administrative Services, the City Commission on Human
   Rights, and the Office of the Corporation Counsel.
2. Such consideration shall adhere to the standards established by Title VII of the Civil
   Rights Act of 1964, the New York State Human Rights Law, and the New York City
   Human Rights Law. Such consideration shall not be governed by the challenged criteria
   set forth in Section IC of the arbitration award for United Federation of Teachers
   members. Accommodations will be considered for all sincerely held religious
   observances, practices, and beliefs.
3. Plaintiffs shall submit to the citywide panel any materials or information they wish to be
   considered within two weeks of entry of this order. The citywide panel shall issue a
   determination on each request no later than two weeks after a plaintiff has submitted such
   information and materials. Within two business days of the entry of this order,
   Defendants shall inform plaintiffs' counsel how such information and materials should be
   transmitted to the citywide panel.
4. The deadline to opt-in to the extended leave program and execute any accompanying
   waiver shall be stayed for Plaintiffs, and no steps will be taken to terminate the plaintiff's
   employment for noncompliance with the vaccination requirement.
5. If a plaintiff's request is granted by the citywide panel, the plaintiff will receive backpay
   running from the date they were placed on leave without pay.
6. This order is intended only to provide for temporary interim relief until the matter is
   considered by the merits panel of this court, which panel may entirely supersede these
   provisions for interim relief, and the parties are at liberty to advocate to the merits panel
   for alteration of these provisions. Unless the merits panel has previously entered a
   superseding order, within two weeks of the conclusion of Plaintiffs' proceedings before
   the citywide panel, the parties shall inform the merits panel of the result of those
   proceedings and advise of any further relief being sought.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

**From:** noreply@salesforce.com <noreply@salesforce.com> on behalf of NYC Employee Vaccine Appeals <vaxappeal@dcas.nyc.gov>
**Sent:** Monday, March 7, 2022 10:40 AM
**To:** Fugelsang Christophe <CFugelsang3@schools.nyc.gov>
**Subject:** Reasonable Accommodation Appeal Determination

The City of New York Reasonable Accommodation Appeals Panel has carefully reviewed your Agency's determination, all of the documentation submitted to the agency and the additional information you submitted in connection with the appeal. Based on this review, the Appeals Panel has decided to deny your appeal. This determination represents the final decision with respect to your reasonable accommodation request.

The decision classification for your appeal is as follows: The employee has failed to establish a sincerely held religious belief that precludes vaccination. DOE has demonstrated that it would be an undue hardship to grant accommodation to the employee given the need for a safe environment for in-person learning

**For all employees other than DOE employees:** Pursuant to the City of New York's policy concerning the vaccine mandate, you now have **three business days** from the date of this notice to submit proof of vaccination. If you do not do so, you will be placed on a leave without pay (LWOP).

**For Department of Education (DOE) employees:** Pursuant to New York City Department of Education policy, you have seven calendar days to extend your Leave Without Pay or return to work. If you do neither, you will be subject to termination. For further information and instructions, please see DOE Denial of Appeal Information.

**From:** Division of Human Resources <DHR@schools.nyc.gov>
**Sent:** Monday, March 21, 2022 5:02 PM
**To:** Fugelsang Christophe <CFugelsang3@schools.nyc.gov>
**Subject:** Termination of NYCDOE Employment

March 17, 2022

FUGELSANG, CHRISTOPHER
TEACHER
EMPL ID: 0963246

Dear FUGELSANG, CHRISTOPHER:

You have previously received notice regarding your failure to comply with the New York City Health Commissioner's Order requiring vaccination of all NYCDOE staff and that you would be terminated from DOE as a result.  Compliance with that Order is a condition of employment. Since you did not comply with the Order and did not choose to extend your leave without pay, despite notice and an opportunity to do so, your employment with the New York City Department of Education is terminated, effective March 17, 2022. Please note that your health insurance coverage through the City also ceases upon termination.

If you have not already done so, you must return all DOE-issued equipment and materials, including your ID, to your supervisor. Information about COBRA will be mailed separately to you at the address on file in NYCAPS. Your school and/or office will be notified of your termination as well.

Thank you for your service to the New York City Department of Education.

Sincerely,

NYCDOE Division of Human Resources



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
89 Washington Ave., Room 987 EBA
Albany, New York 12234

Ph:   **(518) 473-2829**
Fax:  **(518) 402-5940**

*(09/21)*

## Rights of Tenured Employees
*(This document only applies to cases where charges were filed on or after July 1, 2015.)*

This document, while not intended to be exhaustive, describes certain rights of tenured employees in Education Law §3020-a and §3020-b* proceedings. The information contained in this document should not act as a substitute for the applicable statutes or regulations. Individuals are advised to consult with an attorney as significant adverse consequences may result from these proceedings.

> ### Special Notice to Tenured Employees of the New York City Department of Education
>
> *Many of the provisions in Education Law §3020-a and/or 3020-b, including those described in this document, have been substantially modified by the collective bargaining agreement and subsequent amendments and/or revisions between the United Federation of Teachers ("UFT") and the New York City Department of Education ("NYCDOE"). Education Law §3020(3) permits the NYCDOE to modify the provisions of Education Law §3020-a through the collective bargaining process. If you are a tenured employee of the NYCDOE, you are advised to review your collective bargaining agreement and any amendments and/or revisions thereto to determine whether your rights may deviate from the provisions described below. If you have any questions, you should consult with the UFT and/ or an attorney.*

Tenured individuals cannot be disciplined or removed from employment except for "just cause" pursuant to Education Law §3020. The procedures for such discipline or removal are set forth in Education Law §3020-a, Education Law §3020-b, and the Commissioner's Regulations 8 NYCRR Ch. II, Sub. C, Part 82-3.

### Charges

1. The employing board of education ("board") must determine, by a majority vote, that probable cause exists to bring a disciplinary proceeding against the tenured employee ("employee").
2. If the board finds probable cause, the tenured employee must be provided with a written statement specifying: a.) the charges in detail; b.) the maximum penalty the board will seek if the employee is found guilty of the charges or that will be imposed if the employee does not request a hearing; and c.) a copy of this form outlining the employee's rights. The charges must be sent by certified or registered mail, return receipt requested or by personal delivery.
3. Charges cannot be brought more than three years after the alleged incompetency or misconduct, except when the charge is of misconduct constituting a crime when committed.

### Suspension Pending Hearing

The employee may be suspended pending a hearing on the charges and the final determination thereof. An employee may be suspended without pay if: a.) the employee has pleaded guilty to or has been convicted of certain felony drug crimes or a felony crime involving the physical abuse of a minor or student; or b.) the employee is charged with misconduct constituting physical or sexual abuse of a student. Employees suspended without pay due to charges constituting physical or sexual abuse of a student, are entitled to an expedited probable cause hearing.

### Termination Without Hearing

The employee shall be terminated without a hearing upon conviction of a sex offense as defined by Education Law §305(7-a)(b)(2). Employees acting as school administrators or supervisors shall be terminated without a hearing upon conviction of defrauding the government as defined by Education Law §305(7-b)(b)(2).

### Hearing Request/Failure to Request

1. Within 10 days of receiving charges, the employee must provide a written request to the clerk or the secretary of the employing board if the employee desires a hearing on the charges.
2. In the written request for hearing, the employee should indicate the name and contact information for the attorney who will represent the employee, if any. Such attorney shall be authorized to receive all correspondence related to the proceeding on the employee's behalf.

---

## Rights of Tenured Employees *(cont.)*

3. If the employee does not request a hearing within 10 days of receipt of the charges, the employee shall be deemed to have waived the right to a hearing if there is an unexcused failure to request a hearing.

4. If the employee waives his right to a hearing, the board shall proceed, within fifteen days, by a majority vote to determine the case and fix the penalty, if any, to be imposed.

### Hearing Officer Selection Process

1. Within 3 business days of receipt of the written hearing request, the clerk or secretary of the board shall notify the commissioner of the need for a hearing.

2. Upon receipt of such notification, the commissioner shall request that the American Arbitration Association provide a list of names of individuals to potentially serve as hearing officers along with relevant biographical information concerning the individual. The commissioner shall forthwith send such list to both parties.

3. For charges brought pursuant to §3020-a, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 15 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 15 days, the commissioner shall appoint a hearing officer from the list.

4. For charges brought pursuant to §3020-b, where an employee has received two consecutive ineffective ratings, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 7 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 7 days, the commissioner shall appoint a hearing officer from the list.

5. For charges brought pursuant to §3020-b, where an employee has received three consecutive ineffective ratings, the commissioner shall appoint a hearing officer from the list.

### Pre-Hearing Conference

1. The pre-hearing conference shall be private.

2. The hearing officer shall hold a pre-hearing conference within 10-15 days of receipt of notice from the commissioner confirming his or her acceptance to serve in such position, in the case of a standard or expedited §3020-a hearing.

3. For expedited §3020-b hearings where the employee has received 2 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 7 days of receiving notice confirming the hearing officer's agreement to serve.

4. For expedited §3020-b hearings where the employee has received 3 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 5 days of receiving notice confirming the hearing officer's agreement to serve.

5. At the pre-hearing conference, the hearing officer has the power to: a.) issue subpoenas; b.) hear and decide motions and applications made by either party; c.) set a schedule for full and fair disclosure of witnesses and evidence for both parties; and d.) set the time and place for hearings to ensure that the hearing is conducted within the statutory timelines.

6. Generally, pre-hearing motions must be made on written notice to the hearing officer and adverse party at least 5 days before the pre-hearing conference. Any pre-hearing motions not made as provided for herein shall be deemed waived. However, for expedited hearings, written notice to the adverse party shall be made no later than 2 days before the pre-hearing conference.

### General Hearing Procedures

1. The hearing will be conducted by a single hearing officer.

2. The employee shall have a reasonable opportunity to defend his or herself, including making any additional motions and applications and an opportunity to testify on his or her own behalf, however, the employee shall not be required to testify.

3. Each party has the right to be represented by counsel, and may subpoena and cross-examine witnesses. All testimony shall be under oath.

4. An accurate record of the hearing shall be kept at the expense of the commissioner. Upon request, the employee is entitled to a copy of the record without charge.

5. If the hearing officer needs to be replaced and the parties fail to notify the commissioner of their mutually agreed upon replacement within 2 business days, the commissioner shall select the replacement.

---

**Rights of Tenured Employees** *(cont.)*

---

6. At the conclusion of the testimony, the hearing officer may allow the parties to submit memoranda of law; however, such submission may not delay the date that the hearing officer is required to render a decision.

7. In general, hearings must be completed within 60 days of the pre-hearing conference. Please see below for the time periods applicable to particular expedited hearings.

8. In general, all evidence must be submitted within 125 days of the filing of charges and no additional evidence shall be accepted after such time, absent extraordinary circumstances beyond control of the parties.

**Expedited Hearing Based on Revocation of Certification**

1. If the charges are based upon revocation of the employee's certification, an expedited hearing must be held.

2. The hearing shall commence within 7 days of the pre-hearing conference and is limited to one day. The hearing may not be adjourned except upon request of a party and only for good cause as determined by the hearing officer.

**Expedited Hearing Based on Charges Constituting Physical or Sexual Abuse of Student**

1. If the charges are based upon allegations of physical or sexual abuse of a student, an expedited hearing must be held.

2. The hearing shall commence within seven days after the pre-hearing conference and shall be completed within sixty days after the pre-hearing conference. Adjournments may not be granted that would extend the hearing beyond 60 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

**Expedited Hearing Based on Two Consecutive Ineffective APPR Ratings**

1. The Board may bring charges alleging incompetence based upon two consecutive ineffective APPR ratings, in which case an expedited hearing would be held, but the board is not required to bring charges.

2. The hearing must begin within 7 days of the pre-hearing conference and be completed within 90 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 90 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

3. The charges must allege that the board has developed and substantially implemented a teacher or principal improvement plan for the employee following the first evaluation in which the employee was rated ineffective and the immediately preceding evaluation if the employee was rated developing.

**Expedited Hearing Based on Three Consecutive Ineffective APPR Ratings**

1. The Board shall bring charges alleging incompetence where any teacher or principal receives three consecutive ineffective APPR ratings, in which case an expedited hearing must be held.

2. The hearing must commence within 5 days of the pre-hearing conference and be completed within 30 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 30 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

**Decision**

1. With the exception of expedited hearings, the hearing officer shall render a written decision within 30 days of the last hearing date.

2. For expedited hearings, the hearing officer shall render a written decision within 10 days of the last hearing date.

3. The commissioner must immediately forward copies of the decision to the parties.

4. The hearing officer shall render a written decision that includes findings of fact and conclusions, based upon the findings of fact, as to each charge and shall state the penalty, or other action, if any, against the employee on each charge.

### Rights of Tenured Employees *(cont.)*

5. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, a suspension for a fixed time without pay, or dismissal.

6. In determining penalty, the hearing officer shall give serious consideration to the penalty recommended by the board, and if the hearing officer imposes a different penalty, then the hearing officer must indicate the reasons for the alternate penalty based upon the record.

7. Within 15 days of the receipt of the hearing officer's decision, the board shall implement the decision. If the employee is acquitted of the charges, he or she must be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record.

8. The hearing officer shall indicate in the decision whether any of the charges brought by the board were frivolous as defined by the Civil Practice Law and Rules §8303-a. If the hearing officer finds that all of the charges were frivolous, the hearing officer shall order the board to reimburse both the employee and the department reasonable costs that were incurred. If the hearing officer finds that some, but not all of the charges were frivolous, the hearing officer shall order the board to reimburse a portion of the reasonable costs incurred to the department and the employee.

#### Appeal

1. Not later than 10 days after receipt of the hearing officer's decision, either the employee or the board may make an application to the New York State Supreme Court to vacate or modify the hearing officer's decision pursuant to Civil Practice Law and Rules §7511.

2. The filing of the pendency of an appeal shall not delay the implementation of the hearing officer's decision.

#### Restoration of Rights

If an employee who was convicted of a felony crime as specified in Education Law §3020-a(2)(b) has his or her conviction reversed, the employee, upon application, shall be entitled to have his or her pay and other emoluments restored, for the period of time extending from the date of suspension to the date of the decision.

*Pursuant to §§ 30-2.14 and 30-3.17 of the Rules of the Board of Regents, educators whose Annual Professional Performance Reviews (APPRs) include results from the State's growth model (i.e., teachers of grades 4-8 ELA and Mathematics; principals of buildings including those grade levels; and principals of buildings including all of grades 9-12) or any other measures based on the grades 3-8 ELA and Mathematics State assessments will receive both an "original" evaluation and a "transition" evaluation. This process will continue through the 2018-19 school year, during the time that the State transitions to new ELA and Mathematics learning standards and assessments and during that time the State will explore potential revisions to the evaluation framework. The "original" evaluation will include the results of the State's growth model and any other measures based on the grades 3-8 ELA and Mathematics State assessments. This evaluation is provided for advisory purposes only and cannot be used for employment related decisions. Affected educators will also receive a "transition" evaluation that excludes the above referenced measures. During the transition period, only this transition score and rating will be used for purposes of employment decisions, including tenure determinations and for purposes of proceedings under Education Law §§3020-a and 3020-b.